## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**IN RE: AIR CRASH OVER THE SOUTHERN INDIAN OCEAN, ON MARCH 8, 2014**

_____

**This Document Relates To:**

**ALL CASES**

</td><td>

**MDL Docket No. 2712**
**Misc. No. 16-1184 (KBJ)**

</td></tr>
</table>

## MEMORANDUM OPINION

The legal claims in this multi-district litigation ("MDL") arise from one of the greatest aviation mysteries of modern times: the disappearance of Malaysia Airlines Flight MH370 somewhere in the southern Indian Ocean in the early morning hours of March 4, 2014. Flight MH370 took off from Kuala Lumpur International Airport in Malaysia at 12:42 AM that morning, en route to Beijing, China, with 227 passengers and 12 crew members aboard the plane. Thirty-nine minutes after takeoff, while the Boeing 777 aircraft was flying over the South China Sea and transitioning from Malaysian to Vietnamese airspace, Malaysian air traffic controllers lost radar contact with the aircraft. At Malaysia's behest, a massive international search and rescue effort ensued, but neither the plane nor any wreckage was recovered, and on January 28, 2015, the Malaysian Department of Civil Aviation ("MDCA") announced that all aboard Flight MH370 were presumed deceased. Some pieces of wreckage have since washed ashore on islands in the Indian Ocean and on the eastern coast of Africa, but, to date,

most of the plane remains unaccounted for, including the cockpit voice recorder and the flight data recorder.

Following the disappearance of Flight MH370, litigation commenced in both Malaysia and in the United States; many plaintiffs have filed suit in both jurisdictions. In the United States, complaints were filed in California, the District of Columbia, Illinois, New York, South Carolina, and Washington state, and the Judicial Panel on Multidistrict Litigation subsequently centralized the pretrial proceedings with respect to all of these cases in this District.  (*See* Transfer Order, ECF No. 1.)  The complaints in these matters can generally be grouped into two categories.  First, there are cases that assert claims under the Montreal Convention against the defendant airlines—Malaysia Airlines System Berhad (Administrator Appointed) ("MAS") and Malaysia Airlines Berhad ("MAB")—and/or their insurers, Allianz Global Corporate & Specialty SE ("AGCS SE"), and Henning Haagen, an officer at AGCS SE.  Second, there are cases that assert common law wrongful death and products liability claims against airplane manufacturer Boeing, including claims based on a *res ipsa loquitor* tort theory.  There is also a single complaint that resides in the overlap between these two groups—it asserts Montreal Convention, wrongful death, and personal injury claims, and names MAS, MAB, AGCS SE, Haagen, and Boeing as defendants.  All told, 40 complaints are currently pending in this MDL.

Before this Court at present are five ripe motions pertaining to particular threshold issues that various defendants have raised:  (1) a joint motion seeking dismissal of all pending cases based on the doctrine of *forum non conveniens*, in which Defendants argue that it would be more convenient to ligate these matters in Malaysia,

as opposed to the United States (*see* Joint Mem. in Supp. of Mot. to Dismiss on the Ground of *Forum Non Conveniens* ("FNC Mem."), ECF No. 37-1); (2) a motion by MAS and MAB seeking dismissal of the claims against them on the grounds that they are agencies of the Malaysian government and immune from suit in United States courts pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602 (*see* Defs.' MAS and MAB's Mem. in Supp. of Their Rule 12(b)(1) Mot. to Dismiss on the Ground of Immunity Pursuant to the Foreign Sovereign Immunities Act ("FSIA Mem."), ECF No. 39-1)[1]; (3) a motion by MAS seeking dismissal of the Montreal Convention claims against it on the grounds that no provision of the Convention provides a court in the United States with jurisdiction over these claims (*see* Def. MAS's Mem. in Supp. of Its Rule 12(b)(1) Mot. to Dismiss on the Ground of Lack of Subject Matter Juris. Pursuant to the Montreal Convention ("Montreal Convention Mem."), ECF No. 38-1)[2]; (4) a motion by AGCS SE seeking dismissal of the claims against it for lack of personal jurisdiction, because it is a foreign company that did not engage in any conduct connected to the loss of Flight MH370 in any of the jurisdictions in which it has been sued (*see* Def. AGCS SE's Rule 12(b)(2) Mot. to Dismiss for Lack of Personal Juris. ("AGCS SE Pers. Juris. Mot."), ECF No. 35-1); and (5) a motion by AGCS SE and Haagen seeking dismissal for failure to state a claim upon which relief can be granted, in which they argue that Plaintiffs' attempt to make them representatives of MAS and MAB, based solely on their status as alleged insurers of MAS, has no legal foundation (*see* Defs. AGCS SE and Henning Haagen's Mem. in Supp. of Their Rule 12(b)(6) Mot.

---

[1]  MAB and AGCS SE have moved to join this motion.  (*See* Motion for Joinder, ECF No. 41.)

[2]  MAB and AGCS SE have moved to join this motion.  (*See* Motion for Joinder, ECF No. 40.)

to Dismiss for Failure to State a Claim ("Reinsurer Rule 12(b)(6) Mem."), ECF No. 36-1).

This Court has carefully parsed the myriad dismissal arguments Defendants have presented, and as fully explained below, it has determined that, on balance, the claims asserted in the consolidated complaints have a substantial and overriding nexus to Malaysia that outweighs the less substantial connection to the United States. As such, litigation of these claims in the United States is comparatively inconvenient, and Defendants' joint motion for dismissal based on *forum non conveniens* will be **GRANTED**, and Plaintiffs' cases will be **DISMISSED** without prejudice. The remaining threshold motions will be **DENIED** as moot. A separate Order consistent with this Memorandum Opinion will follow.

## I.    FACTUAL BACKGROUND[3]

### A.    The Incident And Its Aftermath

#### 1.    Flight MH370's Disappearance

At 12:42 AM on the morning of March 8, 2014, Flight MH370 took off from Kuala Lumpur International Airport in Malaysia, en route to Beijing, China. (*See* Malaysian ICAO Annex 13 Safety Investigation Team for MH370, Factual Information Safety Investigation For MH370 (March 8, 2015, updated on April 15, 2015) ("Factual Investigation Rpt."), ECF No. 37-4, at 21; Malaysian Department of Civil Aviation

---

[3] The facts contained within this section are derived from the complaints filed in the various underlying actions, as well as the exhibits that the parties have attached to their various filings in this matter. *See Johnson v. PPI Tech. Servs., L.P.*, No. 11cv2773, 2012 WL 1865713, at *2 (E.D. La. May 22, 2012) (explaining that a court adjudicating a *forum non conveniens* motion "is not limited to the allegations in the complaint, but may consider all of the evidence before it"); *see also Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 419 (E.D.N.Y. 2009) (relying on the complaint and materials that the parties had submitted when ruling on a motion seeking dismissal based on *forum non conveniens*).

Press Release ("MDCA Press Release"), ECF No. 37-3, ¶ 3.)[4]  MAS was the national airline of Malaysia at that time (*see* Decl. of Rizani Bin Hassan, Ex. 2 to FISA Mem., ECF No. 39-3, ¶¶ 5, 8, 20–21), and 12 Malaysian citizens staffed Flight MH370—a pilot, a first officer, and 10 cabin crew (*see* MDCA Press Release ¶ 4; Decl. of Mohd Fuad Bin Mohd Sharuji, Ex. 3 to FNC Mem., ECF No. 37-5, at ¶ 15).  Also on board were 227 passengers of 14 nationalities, including 152 Chinese citizens, 38 Malaysian citizens, and three United States citizens.  (*See* Decl. of Tan Sri Dato Seri Adbull Hamid Embong, Ex. 10 to FNC Mem., ECF No. 37-12, ¶ 13).[5]

At 1:19 AM, while the aircraft was over the South China Sea and transitioning from Malaysian airspace to Vietnamese airspace, Malaysian air traffic controllers instructed Flight MH370 to contact Vietnamese air traffic controllers on a specific radio frequency, a request that the pilot in charge acknowledged with, "Good night Malaysian Three Seven Zero."  (Malaysian ICAO Annex 13 Safety Investigation Team for MH370, Safety Investigation Report (July 2, 2018) ("Safety Investigation Rpt."), ECF No. 102-1, at 48, 477.)  The pilot "did not read back the assigned frequency, which was inconsistent with radio-telephony procedures."  (*Id.* at 477.)  This was the last recorded radio transmission that the pilots of Flight MH370 sent, and two minutes later, at 1:21

---

[4]  Page numbers cited herein refer to those that Court's electronic case filing system automatically assigns.

[5]  The U.S. citizens were Philip Wood, Leo Meng, and Nicole Meng.  (*See* No. 1:16cv01063, *Huang* First Am. Compl. ECF No. 9, at ¶ 8; No. 1:16cv01048, *Zhang* 2d Am. Compl., ECF No. 7, ¶ 10; No. 1:16cv00439, *Smith* Compl., ECF No. 1, at ¶ 8; and 1:16cv00053, *Wood* Compl., ECF No. 1, at ¶ 23.) All three were living overseas at the time of the incident.

AM, Malaysian air traffic controllers lost radar contact with the aircraft. (*Id.* at 48–49.)[6]

"The Malaysian military radar and radar sources from two other countries, namely Vietnam and Thailand, also captured the disappearance of the radar position symbol of MH370" in this same timeframe. (*Id.* at 49.) Once Malaysian air traffic controllers lost sight of Flight MH370 on their radar, Malaysian military radar showed a "blip" that appeared to be the plane. However, this "blip" appeared to be diverting from Flight MH370's northerly flight plan; it briefly veered to the right, and then turned left dramatically, flying west-southwest across Malaysia, at variable altitudes and speeds, before turning right when the plane was south of Penang Island, off of the western coast of Malaysia. (*See id.* at 50, 55.) The "blip" indicated that the plane was flying in a west-northwest direction, and it disappeared from the military radar entirely at 2:22 AM, 10 nautical miles north of a flight navigation waypoint known as MEKAR. (*See id.* at 52, 55.)

The Boeing 777 the Malaysia Airlines used as equipment for Flight MH370 was equipped with a satellite communications system, and except for two brief periods, "the aircraft [itself] communicated through the Inmarsat Indian Ocean Region . . . I-3 Satellite and the [Ground Earth Station] in Perth, Australia." (*See id*. at 165.)[7] The satellite connections were briefly lost sometime between 1:07 AM and 2:03 AM,

---

[6] Thirty minutes later, at 1:52 AM, a mobile phone tower at Bandar Baru Farlim Penanang recorded a signal "hit" from the First Officer's mobile telephone, but no actual call took place. (*See* Safety Investigation Rpt. at 66.)

[7] Plaintiffs represent that Inmarasat is located in the United Kingdom. (*See* Pls.' Resp. to the Defs.' Mot. to Dismiss Under the Doctrine of *Forum Non Conveniens*, ("Podhurst FNC Opp'n'), ECF No. 68, at 13 n.4.)

presumably as the result of equipment failing or being powered down, but Flight
MH370's satellite data unit logged back onto the system and sent a "handshake" at 2:25
AM.  (*See id.* at 171.)  The aircraft then initiated five additional "handshakes" before
the satellite communications system again briefly lost power, likely as a result of fuel
running low and engines losing power, but then logged back on.  (*See id.* at 171–175;
480.)  The system initiated a seventh and final "handshake" at 6:19 AM, but when the
Perth ground station attempted to contact the plane again at 7:15 AM, it did not receive
any response.  (*See id.* at 175–76.)

2.    Search Efforts And Subsequent Investigations

Malaysia's Minister of Transport authorized a team of officials—known as the
Malaysian ICAO Annex 13 Safety Investigation Team for MH370 (hereinafter referred
to as the "Malaysian MH370 Investigation Team")—to coordinate the initial search and
rescue efforts, and also to investigate the cause of Flight MH370's disappearance.
(MDCA Press Release ¶ 28.)[8]  On March 17, 2014, at Malaysia's request, the Australian
Transportation Safety Board ("ATSB") "took charge of the coordination of the search
and rescue operation[, and o]ver the next 6 weeks from 18 March, an intensive aerial
and surface search was conducted by assets from Australia, Malaysia, China, Japan,
Korea, UK and the USA."  (ATSB, MH370—Definition of Underwater Search Areas

---

[8]  The Convention on International Civil Aviation, also known as the Chicago Convention, established
the International Civil Aviation Organization ("ICAO"), a specialized agency of the United Nations
that works with the Convention's 192 Member States (including the United States and Malaysia) to
establish standards for regulating international civil aviation.  *See* About ICAO, available at
https://www.icao.int/about-icao/Pages/default.aspx; *see also* Convention on Int'l Aviation, opened for
signature Dec. 7, 1944, 61 Stat. 1180.  Annex 13 to the Chicago Convention, which adopts procedures
for aircraft accident and incident investigation, requires a member state to investigate both incidents
that take place inside its territory and also accidents involving aircraft registered in the member state in
circumstances where the location of the incident cannot be determined to be in any particular state.  *See*
Sections 5.1, 5.3 of Annex 13 to Convention on Int'l Aviation (available at
https://www.emsa.europa.eu/retro/Docs/marine_casualties/annex_13.pdf).

(updated Aug. 18, 2014) ("ATSB June 2014 Rpt."), Ex. E to Pls.' Resp. in Opp'n to Defs.' Mot. to Dismiss on the Ground of *Forum Non Conveniens* ("Motley Rice FNC Opp'n"), ECF No. 67-6, at 7.)

ATSB's initial search for Flight MH370 was focused on the South China Sea, which was the flight's last known location as detected by air traffic control. "The search area was later extended to the Straits of Malacca, to the west of Malaysia, based on military radar showing that an aircraft like Flight MH370 had made an air turn back from the South China Sea and headed west back across the Malaysian Peninsula." (Decl. of Hillary Barr ("Barr Decl."), Ex. 5 to FNC Mem., ECF No. 37-7, ¶ 4.) Using the satellite data "handshakes," investigators plotted the plane's likely course, which included making a southern turn shortly after passing the northern tip of Sumatra, after the plane had disappeared from military radar. (*See* Safety Investigation Rpt. at 184.) "The 52 days of the surface search involving aircraft and surface vessels covered an area of several million square kilometres[,]" and an extensive "sub surface search for the aircraft's underwater locator beacons was also conducted[.]" (*Id.* at 67.)[9]

Ultimately, the search team concluded that Flight MH370 likely crashed in the Southern Indian Ocean after running out of fuel. (*See id.*) "[T]he search and rescue phase transitioned to a search and recovery phase" on April 28, 2014 (MDCA Press Release ¶ 9), and on January 28, 2015, having not located the plane or any wreckage, the MDCA announced that the "data supports the conclusion that MH370 ended its

---

[9] The subsurface search was massive in both scope and scale: "[t]he underwater search started with a bathymetry survey which mapped a total of 710,000 square kilometres of Indian Ocean seafloor and continued with a high-resolution sonar search which covered an area in excess of 120,000 square kilometres." (Safety Investigation Report at 67.)

flight in the southern Indian Ocean[,]" away from any possible landing site.  (*Id.* ¶ 20.)
Accordingly, the MDCA presumed that all passengers and crew had perished.  (*Id.*
¶ 23.)

Three pieces of confirmed wreckage and more than 20 pieces of likely wreckage
have since washed ashore on islands in the Indian Ocean and on the eastern coast of
Africa, but most of the plane remains unaccounted for, including the cockpit voice
recorder and the flight data recorder.  (*See id.* at 185–99.)[10]  In January of 2017, the
governments of Malaysia, Australia, and China officially suspended the underwater
search for Flight MH370.  (*See id.* at 67.)  Thereafter, in January of 2018, a private
company, Ocean Infinity, entered into a contract with the Malaysian government to
conduct an additional underwater search for wreckage, centered on an area that it
believed was most likely to contain wreckage from the aircraft.  (*See id.* at 67, 184.)
Over a period of 90 days, Ocean Infinity searched an additional 112,000 square
kilometers north of this initial search area, also to no avail.  (*See id.*)

### 3.    The Annex 13 Report And Criminal Investigation

With Australia taking the lead on locating the physical remains of Flight MH370,
the Malaysian MH370 Investigation Team—consisting of an Investigator in Charge and
18 additional subordinates—worked with representatives from seven countries to
determine *why* Flight MH370 had disappeared; this investigation is known as "the
Annex 13 Safety Investigation[.]"  (*See* Safety Investigation Rpt. at 15, 443.)  The
United States participated in the Annex 13 Safety Investigation through the National

---

[10]  The various pieces of debris have been taken to different locations for analysis, including France,
Australia, and Malaysia.  (*See* Barr Decl. ¶ 13.)

Transportation Safety Board ("NTSB"), because the United States is the county of manufacture and design of the aircraft, and in this regard, Boeing—which designed and manufactured the aircraft at issue (*see infra* Part I.B)—served as a technical adviser to the NTSB.  (Barr Decl. ¶ 9.)

Australia, the United Kingdom, Singapore, France, China, and Indonesia also participated in the Annex 13 Safety Investigation.  (*See* Safety Investigation Rpt. at 15.) The collective investigative effort involved interviewing more than 120 people, including MAS employees, crew member relatives, Malaysia aviation officials, and representatives of companies that were shipping cargo on Flight MH370.  (*See* Malaysian ICAO Annex 13 Safety Investigation Team for MH370, Interim Stmt., Safety Investigation for MH370 (9M-MRO) (Mar. 8, 2015) ("Safety Investigation Interim Stmt."), Ex. 6 to FNC Mem., ECF No. 37-8, at 3.)  The team also reviewed airline-maintenance records, as well as Boeing's records, air traffic control records and recordings, closed-circuit footage of the crew, bank records, and statements from friends, relatives, co-workers, and medical providers of the crew members.  (*See id.*; Safety Investigation Rpt. at 71, 82.)  Annex 13 investigators thoroughly researched the pilots and the crew members, and even analyzed the voices on the flight's radio transmissions to detect signs of stress.  (*See* Safety Investigation Rpt. at 71–84.)

On July 2, 2018, the Malaysian MH370 Investigation Team issued a 449-page report, which was the culmination of the years-long Annex 13 Safety Investigation's inquiry into the causes of the flight's disappearance.  (*See generally* Safety Investigation Rpt.; *see also id.* at 21 (noting that the "sole objective of the investigation [was] prevention of accidents and incidents [and not] to apportion blame or liability")).)

In that report, the team noted that it "was likely" that the left turn that took the aircraft back over Malaysia "was under manual control and not the autopilot." (*Id.* at 475.) However, the investigators could not determine whether or not "the other two turns over the south of Penang and the north of MEKAR were made under manual control or autopilot." (*Id.*) The report also found that Malaysian air traffic controllers "did not comply fully with established [air traffic control] procedures" and did not initiate emergency procedures "in a timely manner[,]" and that Vietnamese air traffic controllers had also failed to communicate timely with Malaysian controllers about the disappearance of the plane. (*Id.* at 476.)

With respect to the initial loss of communication, investigators reported that

> [a]lthough it cannot be conclusively ruled out that an aircraft or system malfunction was a cause, based on the limited evidence available, it is more likely that the loss of communication (VHF and HF communications, ACARS, SATCOM and Transponder) prior to the diversion is due to the systems being manually turned off or power interrupted to them or additionally in the case of VHF and HF, not used, whether with intent or otherwise.

(*Id.* at 478.) However, the investigation did not otherwise reveal any apparent issues with the crew, nor did it indicate any problems with the plane's systems, maintenance, or cargo. (*See id.* at 486–89.)

Ultimately, the Annex 13 Investigation Team reported that it was simply "unable to determine the real cause for the disappearance of MH370." (*Id.* at 489.) According to the report, this inconclusive result was primarily due to the lack of aircraft wreckage or data from any of the flight recorders—an acute absence of critical information that prevented investigators from definitively ruling in or ruling out any specific causes. (*See id.* at 488–89 ("Without the benefit of the examination of the aircraft wreckage and

recorded flight data information, the investigation was unable to identify any plausible aircraft or systems failure mode that would lead to the observed systems deactivation, diversion from the filed flight plan route and the subsequent flight path taken by the aircraft. However, the same lack of evidence precluded the investigation from definitely eliminating that possibility. The possibility of intervention by a third party cannot be excluded either.").)

The Annex 13 Safety Investigation was not the only review of the potential causes of the Flight MH370 disaster; Malaysian authorities also launched a criminal investigation into Flight MH370's disappearance. As part of the criminal investigation, the Royal Malaysian Police seized a flight simulator from the home of the pilot in charge (*see* Safety Investigation Rpt. at 73), and analysis of this simulator revealed "that there were seven 'manually programmed' waypoint coordinates . . . that when connected together, will create a flight path from [Kuala Lumpur International Airport] to an area south of the Indian Ocean through the Andaman Sea" (*id.* (footnote omitted)). However, the analysis "did not find any data that showed the aircraft was performing climb, attitude or heading manouevres, nor did [it] find any data that showed a similar route flown by MH370." (*Id.*) In connection with its investigation, the Royal Malaysian Police also obtained statements "from the next of kin and relatives, doctors/care givers, co-workers, friends and acquaintances" of the crew members, and reviewed "financial records of the flight crew [and] CCTV recordings at [the airport in

Kuala Lumpur,]" along with "analy[zing] the radio transmission made between MH370 and ground Air Traffic Control." (*See id.* at 404.)[11]

### 4.     The Reorganization Of MAS And The Passage Of Act 765

Malaysia Airlines System Berhad (referred to herein as "MAS") is a "Government Linked Company" under Malaysian law, meaning that "it is a company in which the Government of Malaysia has a direct controlling stake." (FSIA Mem. at 16.) Following the disappearance of Flight MH370, Khazanah Nasional Berhad—a political subdivision of the Government of Malaysia and its sovereign wealth fund—purchased the remaining ownership shares of MAS from minority shareholders, and MAS was delisted from the Malaysian stock exchange. (*See id.* at 17.) The Malaysian government then enacted a law entitled the Malaysian Airline System Berhad (Administration) Act 2015 ("Act 765"), pursuant to which MAS was placed under administration and a new, separate entity—Malaysia Airlines Berhad ("MAB")—was incorporated to operate as the national airline. (*See id.*) Among other things, Act 765 empowers MAS's Administrator to manage and compromise liabilities for the company (Act 765 §§ 9(1)(b–e)); defend MAS in litigation (*id.* §§ 10(g–h)); transfer assets from MAS to MAB (*id.* §10(o)); and liquidate the assets of MAS (*id.* §10(e)). (*See id.* at 32–33.) MAB assumed certain rights and liabilities from MAS, but under the terms of Act 765, MAB is not a successor corporation of MAS, *see id.* § 25(1)(a), and has not assumed any liabilities in connection with Flight MH370, (*see* Ex. 5 to FNC Reply).

---

[11] Citing to news reports, Plaintiffs contend that the United States' Federal Bureau of Investigation also participated in the Royal Malaysian Police's criminal investigation, including analyzing data from the flight simulator. (*See* Podhurst FNC Opp'n at 16 n.20.)

5.   <u>Litigation In Malaysia</u>

As of the briefing of the threshold issues that are now before this Court, there are 27 civil cases pending in the High Court of Malaya at Kuala Lumpur (Civil Division) relating to the loss of Flight MH370, and these cases have been transferred to a single judge for coordinated proceedings.  (Decl. of Saranjit Singh ("Singh Decl."), Ex. 13 to FNC Mem, ECF No. 37-13, ¶ 7.)  Of the 88 decedents represented in legal actions that are part of the instant MDL, 77 are also represented in the cases pending in Malaysia, and the defendants in the Malaysian cases include MAS, MAB, AGCS SE, and a number of Malaysian governmental entities.  (*See id.* ¶ 9.)  Boeing has not been named as a defendant in any of the Malaysian cases.

The Malaysian High Court has declined the plaintiffs' request to stay the Malaysian proceedings pending resolution of the instant *forum non conveniens* motion.  (*See id*. ¶¶ 10–13.)  In addition, the Malaysian High Court also denied the request of some of the attorneys who have filed MDL cases to be admitted to represent their clients in the Malaysian matters.  (*See* Decl. of Tommy Thomas, Ex. 1 to Podhurst FNC Opp'n, ECF No. 68-1, ¶ 11.)

**B.   The Design, Manufacture, And Maintenance Of The Aircraft**

The equipment for Flight MH370 was a Boeing 777-2H6ER (Serial Number 28420) that was designed and manufactured at Boeing's facility in Washington state in May of 2002, and was delivered to MAS in new condition on May 31, 2002.  (*See* Barr Decl. ¶ 17; Fact Investigation Rpt. at 42.)  It is undisputed that all of the records related "to the design, manufacture, assembly, testing, and certification of the 777 model aircraft" are located in Boeing's facilities in Washington, as are the Boeing employees who have knowledge of these matters.  (*See* Barr Decl. ¶ 17.)  In addition, records

related to any customer support that Boeing may have provided to MAS regarding the plane are also located in the United States, possibly in California.  (*See id.*)

After delivery of the aircraft, the MDCA certified the plane as airworthy, and that certification was current at the time of Flight MH370's disappearance.  (*See* Safety Investigation Rpt. at 409.)  MAS was responsible for maintenance of the aircraft, and original records related to such work are located in Malaysia, as are the MAS employees who completed the work.  (*See* Barr Decl. ¶¶ 12–13.)  Review of MAS's maintenance files during the Annex 13 investigation indicated that MAS conducted regular maintenance on the aircraft, and that "all applicable Airworthiness Directives for mandatory compliance were complied with."  (*See* Fact Investigation Rpt. at 44; Safety Investigation Rpt. at 409–411.)[12]  The only maintenance issue that the Annex 13 Investigation revealed was that the battery on the plane's solid state flight data recorder underwater locator beacon was overdue for replacement.  (*See* Safety Investigation Rpt. at 183.)

## II.    PROCEDURAL HISTORY

### A.    The Commencement Of Litigation In The United States

In early 2016, many of the legal representatives or beneficiaries of passengers who had perished on Flight MH370 initiated litigation in the United States related to the disappearance of the flight—a total of 40 cases were initially filed in four different locations (the District of Columbia, California, New York, and Illinois).  (*See* Sch. A to

---

[12] Plaintiffs assert that there are "364 Airworthiness Directives currently posed on the FAA website" related to the Boeing 777-200 aircraft, many of which "concern potential electrical and structure failure[s] of the 777-200[.]"  (Motley Rice FNC Opp'n at 7–8.)  Plaintiffs further contend that records pertaining to these directives are located in the United States.  (*Id.*)

Transfer Order, ECF No. 1; Sch. CTO-1 to Conditional Transfer Order ("CTO-1"), ECF No. 2.)  On June 6, 2016, the JPML centralized all proceedings regarding the disappearance of Flight MH370 in this Court (*see* Transfer Order), and issued orders transferring the pending cases to this Court for coordinated pretrial proceedings (*see id.* at 3; CTO-1 at 1).  After the MDL was created and the initial transfers took place, two additional cases were filed—one in the District of South Carolina, and another in the Western District of Washington—and those two cases were also transferred to this Court.  (*See* Conditional Transfer Order, ECF No. 57, at 3.)

      1.   The Plaintiffs

For the purpose of the instant threshold motions, Plaintiffs have self-divided into two groups, with one group consisting of legal representatives/beneficiaries who are represented by the law firms of Podhurst Orseck, P.A., and Wisner Law Firm P.C. (collectively, the "Podhurst Plaintiffs"), and the second group consisting of similar individuals represented by Motley Rice LLC, and Spagnoletti & Co. (collectively, the "Motley Rice Plaintiffs").  The Podhurst Plaintiffs can be further subdivided into two groups, with the first consisting of the plaintiffs in two cases brought against MAS and MAB under the Montreal Convention,[13] and the second consisting of the plaintiffs in 32 cases that assert state law wrongful death and products liability claims against Boeing.[14]

---

[13]  *See Wood v. Malaysia Airlines Berhad*, 16cv0053; *Gaspard v. Malaysia Airlines Berhad*, 16cv0419.

[14]  *Li v. The Boeing Co.*, 16cv1128; *Xiao v. The Boeing Co.*, 16cv1129; *Gao v. The Boeing Co.*, 16cv1130; *Feng v. The Boeing Co.*, 16cv1131; *Wang v. The Boeing Co.*, 16cv1132; *Wang v. The Boeing Co.*, 16cv1134; *Pang v. The Boeing Co.*, 16cv1135; *Liang v. The Boeing Co.*, 16cv1136; *Hu v. The Boeing Co.*, 16cv1137; *Zhou v. The Boeing Co.*, 16cv1138; *Hu v. The Boeing Co.*, 16cv1139; *Wang v. The Boeing Co.*, 16cv1140; *Zhang v. The Boeing Co.*, 16cv1143; *Tian v. The Boeing Co.*, 16cv1144; *Li v. The Boeing Co.*, 16cv1145; *Shirath v. The Boeing Co.*, 16cv1146; *Jia v. The Boeing Co.*, 16cv1147; *Gaspard v. The Boeing Co.*, 16cv1148; *Wood v. The Boeing Co.*, 16cv1149; *Santhanam v. The Boeing Co.*, 16cv1151; *Huang v. The Boeing Co.*, 16cv1152; *Kolekar v. The Boeing Co.*, 16cv1153; *Han v. The Boeing Co.*, 16cv1161; *Zhang v. The Boeing Co.*, 16cv1164; *Chen v. The Boeing Co.*, 16cv1165;

(*See infra* Part II.A.3.)  The Motley Rice Plaintiffs can similarly be subdivided into groups on the basis of the claims they are asserting.  (*See infra*, Part II.A.3.)  One group of Motley Rice Plaintiffs has brought claims under the Montreal Convention against MAS and MAB, and their complaints additionally name reinsurers AGCS SE and Haagen as defendants.[15]  A second group of Motley Rice Plaintiffs have filed suits that assert state law wrongful death and products liability claims against Boeing.[16]  The final Motley Rice Plaintiffs group consists of a single case that has scores of named plaintiffs and asserts claims related to 44 of the Flight MH370 decedents.[17]  This group asserts *both* Montreal Convention claims *and* wrongful death/products liability claims against all of the defendants.

The Podhurst Plaintiffs are citizens and residents of a variety of countries—four are citizens of the United States; one is a resident of the United States; and 24 are citizens and residents of India, Australia, or China.  (*See* Podhurst FNC Opp'n. at 21–22; *see also infra*, Part IV.A.2; IV.B.2.)  The Podhurst Plaintiffs represent, or are otherwise related to, 62 of the passengers of the fateful Flight MH370, only one of whom was a citizen of the United States.  The rest of the decedents who are referenced in the Podhurst Plaintiffs' complaints are citizens and/or residents of India, Australia, Indonesia, Japan, and China.  (*See* Podhurst FNC Opp'n at 21-22.)

---

*Kolekar v. The Boeing Co.*, 16cv1166; *Gaspard v. The Boeing Co.*, 16cv1296; *Gaspard v. The Boeing Co.*, 16cv1299; *Zhang v. The Boeing Co.*, 16cv1306; *Yuan v. The Boeing Co.*, 16cv1307; *Weeks v. The Boeing Co.*, 16cv1167; *Richards v. The Boeing Co.*, 17cv0503.

[15]  *See Smith v. Malaysia Airlines Berhad*, 16cv0429; *Kanan v. Malaysia Airlines Sys. Berhad*, 16cv1062; *Huang v. Malaysia Airlines Berhad*. 16cv1063.

[16]  *Kanan v. The Boeing Co.*, 16cv1159, *Keith v. The Boeing Company*, 17cv0518.

[17]  *Zhang v. Malaysia Airlines Berhad*, 16cv1048.

Two of the Motley Rice Plaintiffs are citizens of the United States (*see* Compl., *Keith v. The Boeing Co.*, 17cv0518, ECF No. 1, ¶ 1; Compl., *Smith v. Malaysia Airlines Berhad*, 16cv0439, ECF No. 1, ¶ 39), and one appears to be a citizen of Malaysia (*see* Notice of Removal, *Kanan v. The Boeing Co.*, 16cv1159, at 6), while the remainder appear to be citizens of China (*see* Compl., *Zhang v. Malaysia Airlines Berhad*, 16cv1048, ECF No. 1, ¶¶ 42, 44–84). Of the decedents who are referenced in the Motley Rice complaints, two are United States citizens who were residents of China, and one is a lawful permanent resident of the United States who was living in China at the time of Flight MH370's disappearance. (*See* Pls.' Resp. to Def. MAS's Montreal Conv. Mot. ("Motley Rice Montreal Convention Opp'n"), ECF No. 66, at 6.) One appears to be a citizen of Malaysia, and the remainder appear to be citizens of China. (*See Kanan* Notice of Removal at 6; *Zhang Compl.*, ¶¶ 42, 44–84.)

### 2.    The Defendants

The various complaints that comprise this MDL name one or more of five defendants. Defendants MAS and MAB are based in Malaysia, while Boeing's commercial aircraft operations are based on the west coast of the United States, in Washington state. (*See* Part I.B., *supra*.) Four of the pending complaints also name as a defendant AGCS SE, alleging that it is an insurer of MAS; AGCS SE contends that it is a "Societas Europaea"-organized corporation that exists under the laws of the European Union, and that it maintains its principal place of business in Munich, Germany. (*See* AGCS SE Pers. Juris. Mot. at 9.)[18] The final defendant—Haagen—is an executive of AGCS SE; he is named as a defendant in two complaints. (*Id.*)

---

[18] AGCS SE describes its relationship with MAS as "the reinsurer of a retrocession of reinsurance

3.    The Claims

As noted above, the complaints consolidated in this MDL assert two different types of claims:  Montreal Convention claims against MAS and MAB (and in some cases, their insurers), and state law wrongful death and products liability claims against Boeing.

a.    *The Montreal Convention*

The Montreal Convention—formally titled the "Convention for the Unification of Certain Rules for International Carriage by Air"—is an international treaty to which both the United States and Malaysia are parties.  *See* May 28, 1999, S. Treaty Doc. No. 106-45, 1999 WL 33292734 (2000).[19]  The Montreal Convention "sets forth uniform rules for claims that arise out of incidents that occur during international air transportation[,]" *Marotte v. Am. Airlines, Inc*., 296 F.3d 1255, 1258–59 (11th Cir. 2002), and it "applies to all international carriage of persons, baggage or cargo performed by aircraft for reward[,]" Art. 1.1, Montreal Conv.  There is no dispute that the disappearance of Flight MH370 involved international carriage within the meaning of the Montreal Convention.

Article 17 of the Montreal Convention provides that an air "carrier is liable for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking."  Art. 17, Montreal

---

issued by a Malaysian company to the actual direct insurer of MAS"—in other words, a reinsurer of a reinsurer.  (*Id.*)

[19]  The Montreal Convention, which became effective on November 4, 2003, succeeded the Warsaw Convention.  *See Bassam v. Am. Airlines*, 287 Fed. Appx. 309, 312 (5th Cir. 2008) (per curiam).

Conv. "According to Article 21, a carrier is strictly liable up to [113,000] Special Drawing Rights (SDR) . . . for damages sustained in case of death or bodily injury to passengers[.]" *Delgado v. Delta Air Lines, Inc*., No. 12-23272, 2013 WL 9838339, at *4 (S.D. Fla. Oct. 31, 2013) (internal quotation marks and citation omitted).[20]  In addition, an air carrier is liable for damages in excess of the initial 113,000 SDR if the plaintiff claims and establishes such damages, unless the carrier can establish that the "accident is entirely attributable to events wholly outside the carrier's control." *Id*.

The Montreal Convention specifies that a plaintiff generally can file a lawsuit seeking damages under the treaty for passenger death or personal injury, as well as damage to property, "before the court of the [1] domicile of the carrier or [2] of its principal place of business, or [3] where it has a place of business through which the contract has been made or [4] before the court at the place of destination." Montreal Conv., Art. 33.  Moreover, where the claim involves the death or injury of a passenger, a legal action may also be filed in the country where "at the time of the accident the passenger has his or her principal and permanent residence and to or from which the carrier operates services for the carriage of passengers by air, . . . and in which that carrier conducts its business of carriage of passengers by air from premises leased or owned by the carrier itself or by another carrier with which it has a commercial agreement." *Id.*

---

[20] "An SDR is a unit of artificial currency which fluctuates based on the global currency market." *Lee v. Air Canada*, 228 F. Supp. 3d 302, 306 n.5 (S.D.N.Y. 2017).  The Montreal Convention strict liability cap, which was originally set at 100,000, is adjusted periodically, and was 113,000 at the time of the incident.

      b.    *Wrongful Death And Products Liability Tort Claims Pertaining To Aviation Disasters*

Wrongful death claims are a creature of state law, and in the United States typically exist to provide "just compensation" to the survivors of a person wrongfully killed.  *See Reiser v. United States*, 786 F. Supp. 1334, 1335 (N.D. Ill. 1992) (citing Ill. Rev. Stats. Ch. 70 ¶ 2); *see also Aspinall v. McDonnell Douglas Corp.*, 625 F.2d 325, 327 (9th Cir. 1980) (noting that "[u]nder California law the right of a survivor to recover under the wrongful death theory is purely statutory"); *Rentz v. Spokane Cty.*, 438 F. Supp. 2d 1252, 1257 (E.D. Wash. 2006) (explaining that Washington law permits a personal representative of a deceased individual to maintain a wrongful death suit for the benefit of the heirs).  The evidence in a wrongful death case in the context of an aviation disaster, as in other wrongful death cases, typically involves proof of the traditional elements of a negligence claim:  duty, breach, causation, and damages, including proof that the injury was a death.  *See Kasongo v. United States*, 523 F. Supp. 2d 759, 792 (N.D. Ill. 2007).

Products liability claims, which are generally brought under state common law, can proceed under either a strict liability or a negligence theory, and require proof of the causal relationship between a manufacturer's product and the injury a plaintiff has suffered.  *Thornton v. M7 Aerospace LP*, 796 F.3d 757, 770 (7th Cir. 2015); *see also Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 554 (D.C. Cir. 1993) (explaining that "[i]n order to recover, an injured plaintiff must demonstrate not only that the product is defective, but also that the defect proximately caused plaintiff's injury in that but for the defect, the injury would not have occurred" (internal quotation marks and citation omitted)).  Thus, such cases typically involve evidence regarding the nature of

the defect (manufacturing, design, or otherwise); the incident itself; and the damages suffered.  *See id.*  Plaintiffs here intend to rely upon a *res ipsa loquitur* theory of causation, pursuant to which a jury can infer that a manufacturer's negligence caused the plaintiff's injury based on the circumstances of the case, rather than direct proof of a product defect.  (*See* Mot. Hr'g Tr. at 38:4–8.)  *See also* Restatement (Third) of Torts: Phy. & Emot. Harm § 17 (2010).  With respect to aviation disasters, which might involve negligence by someone other than the plane manufacturer, "*res ipsa loquitur* can be found applicable only if the plaintiff has offered evidence tending to negate the presence of causes other than the defendant's negligence."  Restatement (Third) of Torts:  Phy. & Emot. Harm § 17.

### B.    Defendants' Threshold Motions

At the parties' request, this Court ordered initial discovery limited to six topics—*forum non conveniens*; jurisdiction under the Foreign Sovereign Immunities Act; jurisdiction under the Montreal Convention; personal jurisdiction; plaintiffs' capacity to bring suit; and whether plaintiffs have stated a plausible claim against AGCS SE and Haagen—and set a schedule for the briefing and filing of dispositive motions related solely to those topics.  (*See* Scheduling Order, ECF No. 14, at 1–2.) Following the discovery period, Defendants filed the joint motion seeking dismissal under the doctrine of *forum non conveniens* that is the subject of this opinion.  (*See* Joint Mot. to Dismiss on the Ground of *Forum Non Conveniens* ("FNC Mot."), ECF No. 37.)  Various defendants filed four other motions related to these threshold topics.[21]

---

[21]  These are: a motion by MAS and MAB seeking dismissal of the claims against them based on sovereign immunity (*see* Defs.' Rule 12(b)(1) Mot. to Dismiss on the Ground of Immunity Pursuant to the Foreign Sovereign Immunities Act, ECF No. 39); a motion by MAS seeking dismissal of the

In their joint *forum non conveniens* motion, Defendants argue that all of the pending complaints should be dismissed in favor of litigation in Malaysia, under the Supreme Court's holding in *Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981).[22] Defendants maintain that Malaysia is an adequate and available forum for litigation of all of Plaintiffs' claims.  (*See* FNC Opp'n at 21–23.)  They also argue that the balance of private and public factors weighs in favor of dismissal, because the vast majority of evidence regarding liability is in Malaysia, and that it would be difficult to obtain the testimony of unwilling Malaysian witnesses in the United States.  (*See id.* at 24–32.) Defendants further assert that not all potential defendants can be joined as defendants in United States courts (*see id.* at 32–33), and that this Court could be called upon in the context of this litigation to determine the validity of Act 765 (*see id.* at 39–40). Moreover, Defendants contend that Malaysia's interest in resolving lawsuits arising from the disappearance of Flight MH370 far outweighs any interest the United States has in this matter, even taking into account Boeing's status as an American company and the presence of a few American plaintiffs and decedents.  (*See id.* at 37–41.)

Plaintiffs oppose dismissal based on *forum non conveniens*, and the two plaintiffs groups have filed two separate oppositions.[23]  The Podhurst Plaintiffs concede that

---

Montreal Convention for lack of jurisdiction (*see* Def. MAS's Rule 12(b)(1) Mot. to Dismiss Pls.' Compls. On the Ground of Lack of Subject Matter Juris. Pursuant to the Montreal Convention, ECF No. 38); a motion by AGCS SE seeking dismissal of the claims against it for lack of personal jurisdiction (*see* Def. AGCS SE's Rule 12(b)(2) Mot. to Dismiss for Lack of Personal Juris., ECF No. 35); and a motion by AGCS SE and Haagen seeking dismissal for failure to state a claim (*see* Defs. AGCS SE and Henning Haagen's Rule 12(b)(6) Mot. to Dismiss for Failure to State a Claim, ECF No. 36).

[22]  After the two most recent cases were filed and transferred to this Court, Boeing moved to dismiss these two cases on grounds of *forum non conveniens* as well.  (*See* Mot. to Dismiss Newly Transferred Cases, ECF No. 58.)

[23]  (Pls.' Resp. in Opp'n to Defs.' Joint Mot. to Dismiss on the Ground of Forum Non Conveniens, ECF No. 67; Pls.' Resp. to the Defs.' Mot. to Dismiss Under the Doctrine of Forum Non Conveniens, ECF

Malaysia is an adequate and available alternative forum (*see* Podhurst FNC Opp'n at 20 n.30), while the Motley Rice Plaintiffs assert that, because Act 765 has insulated MAB from liability and there is nothing left of MAS, Malaysia is not an adequate forum (*see* Motley Rice FNC Opp'n at 11–17).  Both sets of plaintiffs' briefs also maintain that little, if any, relevant evidence is located in Malaysia because the plane was never found and the Malaysian investigators were unable to determine the cause of the disappearance even after conducting an extensive investigation.  (*See* Podhurst FNC Opp'n at 35–37; Motley Rice FNC Opp'n at 10.)  Plaintiffs further maintain that all records related to Boeing are located in the United States, and that other relevant evidence is located in other countries such as China (records related to Chinese decedents), the United Kingdom (satellite data records), or Australia (search records). (*See* Podhurst FNC Opp'n at 30–42; Motley Rice FNC Opp'n at 8–11).  In this regard, the Podhurst Plaintiffs emphasize that none of the decedents that Podhurst represents are from Malaysia, and that certain of the decedents and plaintiffs in cases they have filed have connections to the United States.  (*See* Podhurst FNC Opp'n at 17–18.)  Both plaintiff groups also insist that the United States has a strong public interest in ensuring that an American aircraft manufacturer produces safe airplanes.  (*See* Podhurst FNC Opp'n at 48–49; Motley Rice FNC Opp'n at 22.)

Defendants' joint *forum non conveniens* motion became ripe for this Court's consideration on September 8, 2017 (*see* Joint Reply in Supp. of FNC Mot., ECF No. 72), and the Court heard oral argument on all of the threshold motions on December 19, 2017 (*see* Min. Entry Of Dec. 19, 2017).

---

No. 68.)

## III.    MOTIONS TO DISMISS BASED ON *FORUM NON CONVENIENS*

Although a court must ordinarily rule upon questions concerning its own

jurisdiction before assessing the merits of any other motion, an exception exists when a

*forum non conveniens* motion is filed; it is well established that a court may opt to

decide a *forum non conveniens* motion before considering any jurisdictional issues.  *See*

*Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007).

The standard used to evaluate a motion seeking dismissal based on the doctrine of

*forum non conveniens* is clear beyond cavil.  The movant bears the burden of showing

that (1) there is an available and adequate alternative forum, and (2) the balance of

various public and private interest factors indicates that maintaining the case in the

current forum is comparatively inconvenient.  *See Piper Aircraft Co.*, 454 U.S. at 254

n.22; *see also Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947); *Agudas Chasidei*

*Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 950 (D.C. Cir. 2008); *Azima v. RAK*

*Inv. Auth.*, 305 F. Supp. 3d 149, 160 (D.D.C. 2018).   "[T]he district court is accorded

substantial flexibility in evaluating a *forum non conveniens* motion, and each case turns

on its facts."  *Van Cauwenberghe v. Biard*, 486 U.S. 517, 529 (1988) (internal citations

and quotation marks omitted).  Indeed, "[i]f central emphasis were placed on any one

factor, the *forum non conveniens* doctrine would lose much of the very flexibility that

makes it so valuable."  *Simon v. Rep. of Hungary*, 277 F. Supp. 3d 42, 62 (D.D.C. 2017)

(internal quotation marks and citation omitted).

A foreign forum is available and adequate when it "provide[s] the plaintiff with

'some' remedy[,]"  *Loya v. Starwood Hotels & Resorts Worldwide, Inc.*, 583 F.3d 656,

666 (9th Cir. 2009), even if the damages available to the plaintiff would be less than

those available in the United States, and even if certain theories of liability are not

recognized, *see Piper Aircraft Co.*, 454 U.S. at 247, 255.  On the other hand, where the alternative forum could not award any relief to a plaintiff at all, courts will find that the forum is not adequate.  *See Nemariam v. Fed. Democratic Republic of Ethiopia*, 315 F.3d 390, 394 (D.C. Cir. 2003) (finding alternative forum was inadequate because the governing law barred plaintiff from directly filing her claim); *Yueh-Lan Wang by & through Winston Wen-Young Wong v. New Mighty U.S. Tr.*, 322 F.R.D. 11, 26 (D.D.C. 2017) (holding that alternative forum was inadequate where plaintiff's claim would be time-barred); *see also In re Air Crash Disaster Near Bombay, India on Jan. 1, 1978*, 531 F. Supp. 1175, 1191 (W.D. Wash. 1982) (finding that a case involving India's national air carrier should be litigated in India, but denying *forum non conveniens* motion where Indian forum was unavailable to plaintiffs).

The public interest factors that a court must consider when assessing a motion to dismiss for *forum non conveniens* include "having localized controversies decided at home"; minimizing "administrative difficulties" such as court congestion and imposing jury duty on citizens in a "community which has no relation to the litigation"; and unnecessarily burdening courts with "problems in choice-of-law and the application of foreign law."  *D & S Consulting, Inc. v. Kingdom of Saudi Arabia*, 322 F. Supp. 3d 45, 49–50 (D.D.C. 2018); *see also Gulf Oil Corp.*, 330 U.S. at 508–09; *Pain v. United Techs. Corp.*, 637 F.2d 775, 791–92 (D.C. Cir. 1980).  And when balancing the private interests in litigating the claims at issue in a particular forum, a court considers a variety of factors, including "the relative ease of access to sources of proof"; the availability of compulsory process for the attendance of witnesses and the cost of obtaining attendance; the enforceability of any judgment; the "possibility of view of

premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Am. Dredging Co. v. Miller*, 510 U.S. 443, 448 (1994) (internal quotation marks and citation omitted).

Because *forum non conveniens* is a procedural question, this Court applies D.C. Circuit law in deciding *forum non conveniens* motions. *See Am. Dredging Co.*, 510 U.S. at 453; *In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1178 (D.C. Cir. 1987). Moreover, and notably, in the context of aviation disasters, "[t]he plaintiff's choice of forum will not be disturbed unless the private and public interest factors strongly favor trial in the foreign country." *In re Air Crash Over Mid-Atl. on June 1, 2009* ("*Air France*"), 760 F. Supp. 2d 832, 839 (N.D. Cal. 2010). Furthermore, the nationality of the plaintiff has some relevance to a court's consideration of the *forum non conveniens* question, as the Supreme Court has explained:

> [T]here is ordinarily a strong presumption in favor of the plaintiff's choice of forum, which may be overcome only when the private and public interest factors clearly point towards trial in the alternative forum. . . . [H]owever, . . . the presumption applies with less force when the plaintiff or real parties in interest are foreign.

*Piper Aircraft Co.*, 454 U.S. at 255.

## IV.    ANALYSIS

Defendants' joint motion for dismissal of the instant MDL cases on *forum non conveniens* grounds requires this Court to consider the adequacy of Malaysia as a forum for litigating claims related to this incident, and, as reflected in the myriad applicable public and private interest factors, the Court must also balance the significant relationship between Malaysia and the claims brought in these cases, on the one hand, against the manifestly less-substantial connection between the Flight MH370 disaster

and the United States, on the other. The substantial connections that exist between the country of Malaysia and the tragic incident that precipitated the legal actions that comprise the instant MDL are undeniable, as explained below. Boeing's role as the missing plane's manufacturer and the alleged U.S. citizenship or resident status of a few of the named plaintiffs and decedents are significant considerations too, but this Court's assessment of the established *forum non conveniens* factors compels the conclusion that neither the Montreal Convention claims nor the wrongful death and products liability claims that are at issue in these cases are ultimately more conveniently litigated in the United States than in Malaysia. As a result, and for the reasons discussed below, the Court concludes that Defendants' motion for dismissal based on *forum non conveniens* must be granted, and the 40 pending cases that compromise this MDL must be dismissed.

A. **On Balance, And When Compared To Malaysia, The United States Is An Inconvenient Forum For The Litigation Of Plaintiffs' Montreal Convention Claims Against MAS/MAB**

Six cases currently pending in this MDL assert Montreal Convention claims against MAS and MAB (and, in two instances, their affiliated insurers): two of the cases that the Podhurst Plaintiffs have filed, and four of the cases that the Motley Rice Plaintiffs have filed. *See Wood v. Malaysia Airlines Berhad*, 16cv0053; *Gaspard v. Malaysia Airlines Berhad*, 16cv0419; *Smith v. Malaysia Airlines Berhad*, 16cv0439; *Kanan v. Malaysia Airlines Sys. Berhad*, 16cv1062; *Huang v. Malaysia Airlines Berhad*. 16cv1063; *Zhang v. Malaysia Airlines Berhad*, 16cv1048. Careful consideration of the established *forum non conveniens* factors persuades this Court that, notwithstanding the fact that some of these cases involve U.S. plaintiffs or decedents, the Montreal

Convention claims that these cases raise would be more conveniently litigated in Malaysia than the United States.  *See Piper Aircraft Co.*, 454 U.S. at 255–56.

      1.   <u>Malaysia Is An Available And Adequate Forum For Litigation Of Plaintiffs' Montreal Convention Claims</u>

With respect to the first factor in the *forum non conveniens* analysis, this Court readily finds that Malaysia is an available and adequate alternative forum for litigation of Plaintiffs' Montreal Convention claims.  *See Giro, Inc. v. Malaysian Airline Sys. Berhad*, No. 10 CIV. 5550 (JGK), 2011 WL 2183171, at *7 (S.D.N.Y. June 3, 2011) (holding that Malaysia is an adequate alternative forum under the *Piper* standard); *Simcox v. McDermott Intl., Inc.*, 152 F.R.D. 689, 700 (S.D. Tex. 1994) (same); *Jayaraman v. Salomon, Inc.*, No. 87 Civ. 2781 (MJL), 1991 WL 61071, at *4 (S.D.N.Y. Apr. 5, 1991) (same).  The Podhurst Plaintiffs do not dispute that the Malaysian courts are available and adequate with respect to litigating these claims (*see* Podhurst FNC Opp'n at 20 n.30), and as noted, cases brought against MAS and MAB relating to the Flight MH370 disaster are currently pending in that country's courts (*see* Singh Decl. ¶ 7).  Malaysia is also a signatory to the Montreal Convention, and because Malaysia is both the domicile and the principal place of business of the airline that operated Flight MH370, Malaysian courts have the power to hear Plaintiffs' Montreal Convention claims under the terms of the Montreal Convention itself.  *See* Montreal Conv., Art. 33.

The Motley Rice Plaintiffs contend nevertheless that Malaysia is not an available and adequate forum for the purpose of the *forum non conveniens* analysis because, due to the Malaysian legislature's enactment of Act 765, "there is nothing left of MAS except one 'Administrator' who has no MAS property, records or assets to administer." (Motley Rice FNC Opp'n at 12.)  In this Court's view, this assertion is an unpersuasive

basis for continuing to litigate these matters in the United States for at least two reasons. First of all, it appears that MAS's status as a former commercial entity is immaterial to its ability to satisfy any judgment against it under the Montreal Convention or otherwise, because MAS holds an insurance policy from which claims and judgments can be paid. (*See* Decl. of Brendan Baxter, Ex. A to AGCS SE Pers. Juris. Mot., ECF No. 35-2, ¶¶ 20–23.) Moreover, even if MAS is judgment-proof, that status hardly compels the conclusion that the United States is a more convenient forum, which is the relevant issue with respect to the *forum non conveniens* analysis. Indeed, if the Motley Rice Plaintiffs are correct that MAS no longer has any assets as a result of the Malaysian legislature's enactment of Act 765, it is debatable whether they can obtain the relief they seek even if their cases remain in the United States. *Cf. Hourani v. Mirtchev*, 796 F.3d 1, 11–12 (D.C. Cir. 2015) (noting that the act of state doctrine "prevents federal courts from declaring invalid the official act of a foreign sovereign involving activities undertaken within its own territory" (alterations, internal quotation marks, and citations omitted)).

In any event, it is well established that the availability and the adequacy of a forum does not turn on whether exactly the same remedy that exists in the United States is available in the foreign forum. *See Piper Aircraft Co*., 454 U.S. at 247, 255 (holding that a forum is adequate so long as some remedy is available, even if the remedy is not as fulsome as in the United States); *see also Chin-Ten Hsu v. New Mighty U.S. Tr*., 308 F. Supp. 3d 178, 185 (D.D.C. 2018) (noting "[t]he inquiry under [*forum non conveniens*] is focused on the availability and adequacy of an alternate forum, not the nuances of each party's respective advantages or disadvantages if the suit is brought

abroad" (internal alterations omitted)). It is only in "rare circumstances where the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory[] that it is no remedy at all, that this requirement is not met." *Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1143 (9th Cir. 2001) (internal quotation marks, citation, and alterations omitted). And Motley Rice has not provided any reason to suggest that plaintiffs "will be deprived of all remedies or treated unfairly" if these cases are litigated in the Malaysian legal system. *Irwin v. World Wildlife Fund, Inc.*, 448 F. Supp. 2d 29, 33 (D.D.C. 2006). *Compare id.* at 34 (finding that Gabon was an adequate and available alternative forum because "the Gabonese legal system would allow plaintiffs to maintain an action against defendant to recover for injuries caused by defendant, Gabonese law recognizes claims that are similar or comparable to the claims in the complaint, and these type of claims are routinely heard in Gabon") *with Nemariam*, 315 F.3d at 394 (holding that alternative forum was inadequate because the legal claim could not be brought under governing law); *Yueh-Lan Wang*, 322 F.R.D. at 26 (same).

Accordingly, this Court finds that Defendants have satisfied the first prong of the *forum non conveniens* test. *See Piper Aircraft Co.*, 454 U.S. at 255.

  2. <u>The Balance Of The Public And Private Interests Weighs In Favor Of Litigation In Malaysia</u>

    a. *Malaysia Has A Significant Public Interest In Litigating The Montreal Convention Claims That Arise From The Disappearance Of Flight MH370*

As to the public interest in litigating the claims at issue, this Court finds that Malaysia has an overwhelming interest in the resolution of any Montreal Convention claims that have been asserted against its own national carrier due to one of the largest aviation disasters in Malaysian history. *See, e.g., In re Air Crash Near Peixoto De*

*Azeveda*, 574 F. Supp. 2d 272, 288 (E.D.N.Y. 2008) (noting that Brazil's interest in resolving litigation involving the largest aviation accident in its history "is obvious"), *aff'd sub nom. Lleras v. Excelaire Servs. Inc.*, 354 F. App'x 585 (2d Cir. 2009); *see also Torreblanca de Aguilar v. Boeing Co.*, 806 F. Supp. 139, 144 (E.D. Tex. 1992) (finding that Mexico had "the paramount interest in this lawsuit" because, among other things, the airline at issue was "owned and regulated by the Mexican government").

To be sure, Flight MH370 disappeared when it was flying over international waters rather than over Malaysian territory (*see* Podhurst FNC Opp'n at 12–13 (arguing that "Flight MH370 crashed . . . not in Malaysia, nor anywhere near Malaysia, but [in the ocean] thousands of miles away")), but Malaysia's myriad connections to that flight are undeniably substantial.  It was Malaysia's national air carrier—MAS—that operated Flight MH370, and the ill-fated aircraft departed from an airport in Kuala Lumpur shortly before its disappearance, as detailed and documented in Part I.A.1 above. Malaysian air traffic controllers were the last persons to have direct contact with the pilot and crew, who were themselves Malaysian citizens.  And after the aircraft vanished, Malaysian officials were responsible for leading the civil safety investigation pursuant to an international treaty.  Malaysian authorities further conducted a separate criminal investigation concerning individuals who were known to have contact with the flight and/or aircraft, and the Malaysian court system has now undertaken to entertain a host of lawsuits that were filed in that jurisdiction by representatives and heirs of the decedents—in fact, 77 of the 88 Flight MH370 passengers whose interests are represented in the cases that are now before this Court are also the subject of pending Malaysian lawsuits that arise out of these same unfortunate circumstances.  What is

more, the Flight MH370 disaster was of such significance to the government of

Malaysia that it enacted legislation reorganizing MAS and creating MAB in the wake of

these events.

All of these facts underscore the very strong Malaysian interest in the Montreal

Convention claims arising from this tragedy.  *See Air France*, 760 F. Supp. 2d at 846

(explaining that "France's interest is especially obvious here because it is also

conducting the official civil investigation and an official criminal investigation");

*Torreblanca de Aguilar*, 806 F. Supp. at 144 (finding that public interest favored

Mexico where, among other things, "[t]he accident investigation was conducted by the

Mexican government at considerable expenditure of resources"); *In re Disaster at

Riyadh Airport, Saudi Arabia, on Aug. 19, 1980*, 540 F. Supp. 1141, 1152 (D.D.C.

1982) (dismissing case based on *forum non conveniens* where airplane was owned and

operated by national corporation of proposed alternative forum and maintained in that

foreign country, and where alternative forum conducted the official investigation of the

accident); *Lumenta v. Bell Helicopter Textron, Inc*., No. 01-14-00207-CV, 2015 WL

5076299, at *6 (Tex. App. Aug. 27, 2015) (granting *forum non conveniens* motion

where crash occurred in Indonesia, and witnesses and relevant records related to

maintenance of aircraft and air traffic control communications with aircraft before crash

were located in Indonesia).

Setting aside the fact that three of the plaintiffs in the MDL cases that assert

Montreal Convention claims have connections to the United States, and four of the

related decedents were either citizens or legal residents of the United States—factors

that are discussed separately in Part IV.A.2.c below—the United States's interest in

Plaintiffs' Montreal Convention claims against MAS and MAB is relatively minor. Indeed, the best that the Motley Rice Plaintiffs can muster on this front is the argument that "the President of the United States promised these plaintiffs, families of the relatives of MH370, in English and Chinese, that the United States of America would do 'all we can to help in the search efforts to find the plane that carried your family members[.]'" (Motley Rice FNC Opp'n at 4 (alterations omitted)). Of course, this is far from a commitment to make the U.S. court system available as a forum for the litigation of these family members' legal claims against Malaysia's national air carrier. And "given the comparatively limited interest that the United States has in resolving litigation stemming from the crash," it is relatively easy to find "that the burden on the judiciary and potential jurors if these matters were kept here is another public interest factor favoring dismissal." *Air France*, 760 F. Supp. 2d at 84; *see also Vivendi SA v. T-Mobile USA, Inc.*, 586 F.3d 689, 696 (9th Cir. 2009); *see also In re Disaster at Riyadh Airport, Saudi Arabia, on Aug. 19, 1980*, 540 F. Supp. at 1152 (finding that "jury duty ought not to be imposed upon the people of the United States nor should United States courts be clogged by processing these cases when the underlying accident has such tenuous contacts to the United States").

Finally, this Court notes that these cases will likely present complex conflicts-of-law questions, which is another public interest factor that weighs in favor of dismissal on *forum non conveniens* grounds. *See Piper Aircraft Co.*, 454 U.S. at 265 (noting that "the public interest factors point towards dismissal where the court would be required to untangle problems in conflict of laws, and in law foreign to itself" (internal quotation marks and citation omitted)); *see also Air France*, 760 F. Supp. 2d at 847 (explaining

that "the possibility that French law will apply is an additional factor favoring dismissal"); *Proyectos Orchimex de Costa Rica, S.A. v. E.I. du Pont de Nemours & Co.*, 896 F. Supp. 1197, 1204 (M.D. Fla. 1995) ("Without deciding the choice of law issue, the court finds that the possibility that foreign law will apply weighs strongly in favor of dismissal."). Indeed, "[t]he selection of the applicable law in aircraft disaster litigation has been a vexing issue for courts over time." *In re Air Crash at Belle Harbor, New York on Nov. 12, 2001*, No. MDL 1448 (RWS), 2006 WL 1288298, at *4 (S.D.N.Y. May 9, 2006); *see also In re Air Crash Off Long Island, New York, on July 17, 1996*, No. 96-cv-7986, 1998 WL 292333, at *11 (S.D.N.Y. June 2, 1998) (noting that "[d]ifficult choice of law issues arise when an aircraft transporting people from several nations meets a tragic end in federal territory not belonging to any state"), *aff'd and remanded*, 209 F.3d 200 (2d Cir. 2000). Courts presiding over cases involving airline disasters have to decide whether to apply the law of the primary place of business of the airline, the law of the decedent's residence, or the law of the place where the accident took place, among other options. *See In re Air Crash Disaster Near Chicago, Ill. on May 25, 1979*, 644 F.2d 594, 604 (7th Cir. 1981). The parties here have already pointed to a variety of jurisdictions as possible sources of governing law in this case, including Malaysian law, Chinese law, the U.S. Death on the High Seas Act, and the common law of the various states where the plaintiffs initially filed their complaints. (*See* FNC Mem. at 42; Podhurst FNC Opp'n at 53–55.)

"The doctrine of *forum non conveniens* . . . is designed in part to help courts avoid conducting complex exercises in comparative law." *Piper Aircraft Co.*, 454 U.S. at 251. It is also potentially troubling that this Court might be called upon to consider

the validity of Act 765, which the Motley Rice Plaintiffs have alleged is invalid and improper.  (Motley Rice FNC Opp'n at 13–16.)  Questions regarding the validity of foreign laws that are effective in foreign countries are better left to courts in those countries, *see Hourani*, 796 F.3d at 11–12; thus, the possibility that this Court might have to address such complex, novel legal issues is another public interest factor that weighs heavily in favor of dismissing the Montreal Convention claim cases.

b.    *The Private Interests Also Generally Weigh In Favor Of Litigating Plaintiffs' Montreal Convention Claims In Malaysia*

As explained above, the relevant private interest factors in the *forum non conveniens* analysis include "the relative ease of access to sources of proof; [the] availability of compulsory process for attendance of unwilling [witnesses] and the cost of obtaining attendance of willing[] witnesses; [the] possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive."  *Gulf Oil Corp.*, 330 U.S. at 508.  This Court's evaluation of these and similar private interest factors begins with the recognition that standard Montreal Convention claims are strict liability claims that ordinarily raise limited questions of fact—specifically, whether an accident occurred with respect to a carrier's aircraft, and the amount of damages suffered.  *See* Art. 21, Montreal Conv. (imposing strict liability on a carrier for damages up to a set amount of special drawing rights).  Moreover, here, in addition to the lack of any dispute regarding the existence of the Flight MH370 disaster, Plaintiffs have agreed to make all damages-related evidence available, at their own expense, in the United States.  (*See* Podhurst FNC Opp'n at 33 n.59.)  Thus, litigation of Plaintiff's strict liability Montreal Convention claims in the United States will not necessarily inconvenience Defendants.

However, with respect to the Montreal Convention claims at issue in this MDL, the private interest-balancing inquiry does not stop there, because Plaintiffs have made clear that they are seeking damages *in excess* of the first 113,000 special drawing rights. (*See, e.g.*, Compl., *Wood v. Malaysia Airlines Berhad*, 16cv0053, ECF No. 1, ¶ 59; Compl., *Smith v. Malaysia Airlines Berhad*, 16cv0439, ECF No. 1, ¶ 115.)  The Montreal Convention permits plaintiffs to recover such excess damages (assuming their evidence establishes those loss values), but the carrier is also authorized to defend against any such judgment by demonstrating that the "accident is entirely attributable to events wholly outside the carrier's control."  *Delgado*, 2013 WL 9838339, at *4.  And it is *that* inquiry that will necessarily expand the scope of the litigation related to Plaintiffs' Montreal Convention claims such that litigating these claims in the United States could become unduly burdensome.

This is so because the logical alternative party to which MAS/MAB could point as being responsible for the disappearance of Flight MH370 is aircraft manufacturer Boeing—Plaintiffs have acknowledged (and embraced) this possibility, presumably because Boeing is a U.S. corporation.  (*See* Podhurst FNC Opp'n at 31–35; *see also id.* at 35–36 (observing that the evidence pertaining to Boeing's role in manufacturing the aircraft at issue is located in the United States).)  And Boeing's response to any such charge might well be to contend that the design and manufacture of the aircraft was not responsible for Flight MH370's disappearance; instead its loss was caused by some other factor—such as pilot suicide, cargo fire, or terrorism—and such allegations plainly open the door to an assessment of what, in fact, caused Flight MH370 to disappear.  In other words, because a carrier sued under the Montreal Convention can

cast blame on other potentially responsible parties to defend against the plaintiffs'
recovery of amounts in excess of the 113,000 drawing rights strict-liability cap, and
those other parties can point to other potential causes, any claim for excess damages
*necessarily* involves the possibility of full-blown litigation into the fault issue that the
strict-liability aspect of Montreal Convention claims seeks to avoid.

And, of course, once liability is at issue, MAS/MAB and any other implead
defendants would be entitled to take discovery on that topic.  *See* Fed. R. Civ. P 26(b)
(authorizing parties to take discovery "regarding any nonprivileged matter that is
relevant to any party's claim or defense").  Here, liability-related evidence might
include satellite-communication evidence located in the United Kingdom, debris
evidence in France and Australia, and search records that are also located in Australia,
and the discovery quest would also inevitably include seeking the potentially vast
amounts of materials and information that are located in Malaysia, including personnel
files, airline maintenance records, manuals, air traffic control recordings, video
recordings, cargo records, and bank records.  *See Pain*, 637 F.2d at 786–87 (noting that
maintenance records and accident reports prepared by a foreign government were
relevant to an aircraft manufacturer's defense or tort claims arising from crash).  Many
relevant witnesses are also located in Malaysia, including airline employees, family
members and acquaintances of the crew, air traffic controllers, cargo shippers, and
Malaysian investigators, among others.  And the fact that Malaysia is not a party to the
Hague Convention means that the only way to enforce any discovery requests on any
unwilling Malaysian parties would be through the "burdensome, costly, and time-
consuming" letters rogatory process.  *Quaak v. KPMG Bedrijfsrevisoren*, 361 F.3d 11,

21 & n.4 (1st Cir. 2004).  (*See also* FNC Mem. at 31; Podhurst FNC Opp'n at 42 (acknowledging that Malaysia is not subject to the Hague Convention).)

Courts regularly find that the inability to compel witnesses and evidence except through letters rogatory is a compelling factor that weighs in favor of dismissal based on *forum non conveniens*.  *See, e.g.*, *Tazoe v. Airbus S.A.S.*, 631 F.3d 1321, 1331 (11th Cir. 2011) (affirming *forum non conveniens* dismissal where United States court "lack[ed] the authority to compel certain witnesses to attend proceedings in that jurisdiction"); *Clerides v. Boeing Co.*, 534 F.3d 623, 630 (7th Cir. 2008) (affirming *forum non conveniens* dismissal where "the court concluded reasonably that the superiority of live testimony and the inconvenience of taped depositions obtained by letters rogatory favored dismissal").  This Court considers this potential practical problem to be a compelling argument that supports dismissal of the instant cases.

Plaintiffs' response is to insist that there is really no need to look at Malaysian sources of evidence, nor should the Court be concerned about the difficulty of enforcing any discovery-related subpoenas, because the Annex 13 Safety Investigation did not unearth any issues with maintenance of the plane, the pilots, the weather, cargo, or anything else that pointed to the cause of the incident, so it is safe to assume that no relevant evidence currently exists in Malaysia.  (*See* Motley Rice FNC Opp'n at 4 ("[A]lmost no evidence is in Malaysia—a fact confirmed in Malaysia's Safety Investigation for MH370."); Mot. Hr'g Tr. (Dec. 19, 2017), ECF No. 90, at 39:25–40:1 (arguing that "there is no evidence in Malaysia relevant to the question of what happened to this plane").)  Plaintiffs fail to cite a single case that squarely supports the proposition that a civil defendant is barred from revisiting issues and evidence that were

explored during an investigation conducted under Annex 13 of the Convention on International Civil Aviation, much less that a court must grant preclusive effect to the conclusions of any such Annex 13 investigation in the context of related civil litigation. Rather, it is axiomatic that civil defendants have the right to develop and present their defense, and in this case, because Plaintiffs are seeking damages in excess of the strict-liability drawing rights cap, the defense would necessarily involve discovery pertaining to the issue of fault, including exploration of any and all potential causes of the disappearance of Flight MH370.  *See Nolan v. Boeing Co.*, 762 F. Supp. 680, 683 (E.D. La. 1989), *aff'd*, 919 F.2d 1058 (5th Cir. 1990).

Two final points bear noting.  First, except as discussed in Part IV.A.2(c) below, the vast majority of the Montreal Convention decedents appear to have no connections whatsoever to the United States or Malaysia.  42 of the 45 decedents who are referenced in Motley Rice's cases, in particular, are citizens of China.  (*See*, Compl., *Zhang v. Malaysia Airlines Berhad*, 16cv1048, ECF No. 1, ¶¶ 42, 44–84; Compl., *Kanan v. Malaysia Airlines System Berhad*, 16cv1062, ¶ 8 (naming a Malaysian decedent); Compl., *Smith v. Malaysia Airlines Berhad*, 16cv0439, ECF No. 1, ¶¶ 41–42 (naming two American decedents).)  The plaintiffs who are proceeding on behalf of these 42 individuals appear to have brought these Montreal Convention claims in the United States solely by virtue of Defendants AGCS SE American and Haagen—alleged reinsurers of MAS/MAB who purportedly do business in the United States.  (*See* Pls.' Resp. in Opp'n to Def. MAB's Mot. to Dismiss Pls.' Compls. on the Ground of Lack of Subject Matter Jurisdiction Pursuant to the Montreal Convention, ECF No. 66 at 12–13.)  This means that most of the evidence related to the damages claimed in Motley

Rice's cases will likely be located in China or Malaysia. And it is no more convenient to have that evidence translated into English and brought to the United States than it is to have that evidence translated to Malay and brought to the Malaysian courts to be considered along with any other evidence pertaining to both damages and liability that the parties will marshal in litigating the expanded universe of issues that these Montreal Convention claims raise. *See In re Air Crash at Madrid, Spain, on Aug. 20, 2008*, 893 F. Supp. 2d 1020, 1033 (C.D. Cal. 2011) (noting that "no matter where these suits are tried, one side will face difficulty in gathering evidence and presenting witnesses for its case"), *amended on reconsideration in part sub nom. In re Air Crash at Madrid, Spain*, No. 2:10-ML-02135-GAF, 2011 WL 2183972 (C.D. Cal. May 16, 2011), *and aff'd sub nom. Fortaner v. Boeing Co.*, 504 F. App'x 573 (9th Cir. 2013).

The second residual point is the fact that, because Plaintiffs have opted to sue both MAS and MAB (on the grounds that MAB is, in effect, a successor to MAS), evidence regarding the contractual relationship between these two entities is likely to be relevant to any determination of which entity is responsibility for the payment of damages with respect to Plaintiffs' Montreal Convention claims. *See Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*, 247 F. Supp. 3d 76, 88 (D.D.C. 2017) (explaining that a successor corporation generally does not assume liabilities of predecessor unless, among other things, there was an agreement to transfer the liabilities). That evidence, too, will be undoubtedly be located in Malaysia—yet another factor that weighs in favor of dismissal of Plaintiffs' Montreal Convention claims on *forum non conveniens* grounds.

c.    *The Fact That Some Of Plaintiffs' Montreal Convention Claims Involve Plaintiffs Or Decedents With United States Connections Is Insufficient to Alter The Outcome*

The strongest point that Plaintiffs make in favor of maintaining the Montreal Convention claims against MAS/MAB in United States courts is the fact that a plaintiff's choice of forum generally controls, and that some of the plaintiffs and/or decedents in the cases at issue here have connections to the United States.  (*See* Podhurst FNC Opp'n at 21–22.)  It is clear beyond cavil that, when faced with a motion seeking dismissal based on *forum non conveniens*, a court must grant deference to a plaintiff's choice of forum.  *See Piper Aircraft Co.*, 454 U.S. at 255.  The level of deference varies based on the nationality of the plaintiff, with a foreign plaintiff being entitled to less deference than a domestic plaintiff.  *Id.* at 255–256; *see also Ravelo Monegro v. Rosa*, 211 F.3d 509, 514 (9th Cir. 2000) (noting that "less deference is not the same thing as no deference").  "The presence of American plaintiffs, however, is not in and of itself sufficient to bar a district court from dismissing a case on the ground of *forum non conveniens*"; rather, a court must still conduct the *Piper Aircraft* balancing test.  *Cheng v. Boeing Co.*, 708 F.2d 1406, 1411 (9th Cir. 1983); *see also Pain*, 637 F.2d at 795–99 (holding that a district court did not abuse its discretion in granting *forum non conveniens* motion, notwithstanding the presence of an American plaintiff, when aviation accident took place in the North Sea).

Two of the Montreal Convention plaintiffs in this MDL, Smith and Gaspard, are United States citizens who are the personal representatives of the estates of decedent passengers, and their choice of forum is therefore afforded deference under *Piper Aircraft*.  *See Piper Aircraft Co.*, 454 U.S. at 255.  However, it is not readily apparent that either Smith or Gaspard had any pre-accident connection to the decedents, and the

possibility that they were selected solely for purposes of this litigation cases doubt on the suggestion that their choice of forum warrants significant deference. (*See Gaspard v. Malaysia Airlines Berhad*, 16cv0419; *Smith v. Malaysia Airlines Berhad*, 16cv0439.) *See also Piper Aircraft Co.*, 454 U.S. at 239 (noting that personal representative "was a legal secretary to the attorney who filed this lawsuit" and did "not know any of the decedents or their survivors"). Plaintiff Gaspard represents, among others, a family of three decedents, Rui Wang (who was employed by an American company and the provider of the family), Weiwei Jiao, and Shuling Dai (collectively, the "Wang Decedents"). (*See Gaspard* Compl., ECF No. 1, ¶¶ 3–7; Podhurst FNC Opp'n at 33.) Plaintiff Smith represents, among others, Nicole and Leo Meng, minor children who were United States citizens by birth and who resided with their parents in China. (*See Smith* Compl., ECF No. 1, ¶¶ 39–42.) Smith also represents Meng Zhang, a Chinese citizen who held a United States green card, and who was residing in China with her new husband when she flew aboard Flight MH370. (*See id.*; *see* Motley Rice Montreal Convention Opp'n at 6.)[24]

Only one other Montreal Convention plaintiff has any connection to the United States: Thomas Wood, who is a United States citizen and the personal representative of his brother, Flight MH370 decedent Philip Wood, who was also a United States citizen. (*See Wood v. Malaysia Airlines Berhad*, 16-cv-0053.) This Court will afford Thomas Wood's choice of forum the highest degree of deference. *See Piper Aircraft Co.*, 454

---

[24] The Meng children and Zhang are all Motley Rice plaintiffs, and their counsel filed complaints on their behalf in three separate districts. Those complaints are the subject of a motion for leave to file a consolidated amended complaint (*see* Pls.' Mot. for Leave to File Consolidated Compl., ECF No. 24), which is yet another motion that is mooted by the Court's instant decision. For the purpose of the *forum non conveniens* analysis, this Court has focused on *Smith v. Malaysia Airlines Berhad*, 16cv0439, the complaint that contains the most allegations regarding connections to the United States.

U.S. at 255.  Decedent Wood worked for IBM and resided in Texas until late 2010/early 2011, when he moved to China for a three-year international assignment, following his separation from his wife.  (*See* Pls.' Resp. to Malaysia Airlines' Motion to Dismiss for Lack of Subject Matter Jurisdiction, ECF No. 63, at 40.)  While in China, Wood began a romantic relationship, and thereafter moved to Malaysia when he accepted a two-year assignment with IBM-Malaysia in Kuala Lumpur.  This assignment would have ended in February of 2016 (and could have been renewed for additional terms).  (*See id.* at 21 n.37, 40.)

Notably, the fact that all of the decedents were living abroad (i.e., not in the United States) at the time of their deaths is an additional consideration to be taken into account when determining what weight to give to the United States connections that Plaintiffs have asserted in these cases.  *See Varnelo v. Eastwind Transp., Ltd*., No. 02-cv-2084, 2003 WL 230741, at *12 (S.D.N.Y. Feb. 3, 2003) (noting the choice of forum of "an expatriate U.S. citizen living abroad" is afforded a "diminished degree of deference").  As the Second Circuit has explained, United States residence supports a plaintiff's choice to litigate in the United States "not because of chauvinism or bias in favor of U.S. residents" but "rather because the greater the plaintiff's ties to the plaintiff's chosen forum, the more likely it is that the plaintiff would be inconvenienced by a requirement to bring the claim in a foreign jurisdiction."  *Wiwa v. Royal Dutch Petroleum Co*., 226 F.3d 88, 102 (2d Cir. 2000).  Alternatively, where a plaintiff (or the decedent whom that plaintiff represents) is (or was) located overseas, the inconvenience of having to litigate issues pertaining to damages and other matters in a non-U.S. forum is somewhat lessened.

With the relative degrees of deference that must be afforded to these U.S.-connected plaintiffs and/or decedents in mind, this Court has undertaken to determine whether the balance of the public and private interests discussed above shifts.  With respect to the Wang Decedents, the United States' interest in these claims is still minimal, as the sole connection to this country (other than the citizenship of the personal representative) is the fact that the Wang Decedents' tickets were purchased through a US-based online travel agent.  (*See* Gaspard Compl. ¶ 18(g).)  Likewise, the United States has a relatively minor interest in claims associated with the death of Zhang, because although she was a United States green card holder, she had been residing in China with her new husband in the years prior to her death.  (*See* Resp. to MAS's and MAB's Interrogs. for Passenger Meng Zhang, at Nos. 3–12, Ex. 51 to Montreal Convention Mem., ECF No. 38-52.)  By contrast, the United States interest in the claims related to the Meng children and Decedent Wood is substantial, because these decedents are citizens of the United States.  *See Air France*, 760 F. Supp. 2d at 847 (acknowledging "the importance of making courts in this country available to American citizens").

In *Air France*, the court considered whether or not to dismiss on *forum non conveniens* grounds Montreal Convention claims that had been brought by U.S.-citizen plaintiffs involving U.S.-citizen decedents, *see Air France*, 760 F. Supp. 2d 832, and was unmoved by the suggestion that the citizenship status of the small number of represented parties was sufficient to sway the analysis toward maintaining the lawsuits in the United States.  The *Air France* litigation arose from the crash over the Atlantic Ocean of an Air France flight that had "left Brazil for France carrying a plurality of

French citizens and just two Americans living abroad at the time of the crash[,]" and the *Air France* plaintiffs had sued the American companies that manufactured component parts of the aircraft, among others, in United States courts. *Id.* at 845. In the context of its *forum non conveniens* analysis, the court specifically found that, while "the American interest here, ensuring the quality of component parts on aircraft *and protecting the rights of two American citizens*, is real and legitimate[,]" it was "less significant than the French interest." *Id.* (emphasis added).

So it is here. All told, the Montreal Convention cases in this MDL involve only six U.S. citizens with a direct connection to the Flight MH370 tragedy, as either plaintiffs or decedents. Among the hundreds of passengers on that flight, only three were citizens of the United States (*see* Part IV.A.2.a., *supra*), and while the United States undoubtedly has a strong public interest in the claims involving their deaths, its interest pales in comparison to Malaysia's interest in litigating these claims. Malaysia's public interest includes not only an interest in the untimely deaths of the Malaysian pilot and crew, but also an interest in determining precisely what happened to Flight MH370, given that a Malaysian airline owned, operated, and maintained the aircraft; the flight took off from an airport in Malaysia for a destination outside the United States; and it disappeared from radar when Malaysian air traffic controllers were handing off the flight. And Malaysian authorities made substantial investments of time and resources in the wake of this disaster: Malaysia conducted extensive civil and criminal investigations, and changes in Malaysian law led to the creation of a new national Malaysian airline. It is Malaysia's strong interest in the events that give rise to the claims at issue here that makes this a distinctly *Malaysian* tragedy, notwithstanding

the presence of the few Americans onboard Flight MH370.  Thus, just as the *Air France* court found that France had a greater public interest in the Montreal Convention claims concerning U.S. plaintiffs and decedents than the United States did, so too does this Court find that, on balance and comparatively speaking, Malaysia has a greater public interest in the instant Montreal Convention claims, even taking into account the United States citizenship of plaintiffs Wood, Smith, and Gaspard, and of Philip Wood and the Meng children.

In addition to this public interest, this Court must also consider the private interests that, as noted above, implicate the practicality of litigating a particular matter in one forum or another.  *See Am. Dredging Co.*, 510 U.S. at 448 (requiring the court to consider, among other things, access to sources of proof, enforceability of judgment, and the location of relevant evidence and witnesses).  When considering the Montreal Convention claims of plaintiffs and decedents with connections to the United States, the most substantial difference on the private interest front could be the location of, and access to, evidence and witnesses regarding damages.  However, no such differences exist with respect to the Meng children who, while United States citizens, spent almost all of their lives with their parents in China.  (*See* Resps. to MAS's and MAB's First Set of Interrogs. for Bing Meng, at Nos. 2–3, Ex. 14 to FNC Mem., ECF No. 37-16.)  Zhang and the Wang Decedents are on somewhat different footing:  Zhang had some employment history in the United States and allegedly intended to return there, even though her most recent work history appears to have been in China (*see* Motley Rice Montreal Convention Opp'n at 6), and Rui Wang's wages from a U.S.-based employer supported the Wang Decedents (*See* Podhurst FNC Opp'n at 33).  Likewise, evidence

regarding damages in regard to Decedent Wood's estate and his heirs will likely be located in the United States, given his United States citizenship and family connections, and his employment with IBM.  (*See* Podhurst FNC Opp'n at 32–33.)

Nevertheless, as discussed in Part IV.A.2.b., *supra*, the relevant evidence in this case extends beyond damages and into the realm of causation.  And as far as this Court can tell, a substantial amount of this causation evidence is located outside of the United States, including documentary items such as cargo records, personnel files, airline maintenance records, manuals, air traffic control recordings, video recordings, and bank records, as well as witnesses, such as crew family members, air traffic controllers, cargo shippers, and maintenance technicians.  *See Pain*, 637 F.2d at 786–87.  *Cf. In re W. Caribbean Crew Members*, 632 F. Supp. 2d 1193, 1201–03 (S.D. Fla. 2009) (denying *forum non conveniens* motion where plane was located in United States for 19 years before crash, and relevant maintenance records were therefore located in the United States).  As explained, significant practical problems with gathering such evidence could arise in the context of both discovery and trial, even taking into account that some of the damages evidence would be located in the United States with respect to these claims.  *See Tazoe*, 631 F.3d at 1335 (finding that district court did not abuse its discretion in dismissing claims arising from death of an American citizen in a plane crash that occurred in Brazil where the defendant manufacturers' "inability to compel third-party witnesses or the production of documents from those witnesses, and the inability to implead potentially liable third-parties, is both unusually extreme and materially unjust").  Indeed, even where claims involving United States parties are involved, courts considering *forum non conveniens* motions regularly find that

48

"difficulties in obtaining testimony and evidence located in foreign jurisdictions is a strong factor favoring *forum non conveniens* dismissal." *Torreblanca de Aguilar*, 806 F. Supp. at 144; *see, also, e.g.*, *Clerides*, 534 F.3d at 629–30; *Lleras*, 354 F. App'x at 587.

To summarize, after considering the availability and adequacy of Malaysia as an alternative forum for ligating Plaintiffs' Montreal Convention claims, balancing the relative public interests of Malaysia and the United States in resolving these claims, and weighing the private interests that inform whether litigating in Malaysia would be substantially more convenient than in the United States, this Court has determined that the substantial and overriding connections to Malaysia outweigh the connections these claims have to the United States, such that *forum non conveniens* dismissal is warranted here.

**B.    On Balance, Malaysia Is A More Convenient Forum Than The United States For Litigating Plaintiffs' Wrongful Death And Products Liability Claims Against Boeing**

Thirty-five of the cases currently pending in this MDL assert wrongful death and products liability claims against Boeing.  (*See* Notes 14, 16–17, *supra* (listing 32 Podhurst products liability cases and three Motley Rice products liability cases).) Podhurst and Motley Rice have filed these cases on behalf of various plaintiffs.  Five of the products liability plaintiffs (Wood, Gaspard, Li Li, Smith, and Keith) are United States citizens, as are three of the various decedents these plaintiffs represent (Philip Wood, Nicole Meng, and Leo Meng).  One products liability plaintiff resides in the United States (Yang Chen).[25]  In addition, one of the decedents represented in the

---

[25]  *See Chen v. The Boeing Co.*, 16cv1165.

products liability cases (Meng Zhang) held a United States green card.

While the public and private considerations with respect to these claims differ from those involved with the Montreal Convention claims, this Court reaches the same conclusion regarding the *forum non conveniens* analysis, as explained below. Once again, the Court agrees with Boeing that these claims must be dismissed, because, on balance and in light of the relevant factors, litigation of these claims in the United States will be less convenient than in Malaysia.

1. Malaysia Is An Available And Adequate Forum For Plaintiffs' Wrongful Death And Products Liability Claims

Just as with Plaintiffs' Montreal Convention claims, this Court finds that Malaysia is an available and adequate alternative forum for litigation of Plaintiffs' wrongful death and products liability claims against Boeing. *See Giro*, 2011 WL 2183171, at *7; *Simcox*, 152 F.R.D. at 700; *Jayaraman*, 1991 WL 61071, at *4. Plaintiffs do not contend that such legal claims are unavailable in Malaysian courts. *Cf. Domanus v. Lewicki*, 645 F. Supp. 2d 697, 702 n.2 (N.D. Ill. 2009) (finding that Poland was not an adequate alternative forum where "Polish law does not recognize many of the causes of action asserted, including shareholder derivative claims"). And Boeing has consented to being subjected to the jurisdiction of Malaysia's courts as a condition of the *forum non conveniens* dismissal of this matter. (*See* FNC Mem. at 22 & n.5.) Boeing has further agreed to toll the statute of limitations with respect to any such claims for 120 days (*id.*), and it is well established that defendant concessions of this type undermine the argument that a foreign forum is not available and/or is inadequate to litigate claims against the agreeing party. *See, e.g.*, *Piper Aircraft Co.*, 454 U.S. at 254 n.22; *Pain*, 637 F.2d at 785.

Once again, the Podhurst Plaintiffs do not dispute that Malaysia is an available and adequate forum for the products liability claims that they seek to litigate.  (*See* Podhurst FNC Opp'n at 20 n.30.)  The Motley Rice Plaintiffs object to dismissal in favor of Malaysia, on the grounds that Boeing has not specifically agreed to "participate in U.S.-style discovery" in that jurisdiction, and because the other defendants in this matter have not provided assurances about participating in litigation in Malaysia. (Motley Rice FNC Opp'n at 17.)  But Motley Rice has not pointed to any particular prejudicial deficiencies in Malaysia's own fact-finding process that would indicate the inadequacy of such proceedings such that a concession in this regard is needed. Moreover, and in any event, the fact that the United States may have a more robust discovery process than that of another country is not sufficient to establish that the other forum is unavailable or inadequate for *forum non conveniens* purposes.  *See, e.g.*, *FieldTurf USA Inc. v. TenCate Thiolon Middle E., LLC*, No. 11-cv-50, 2011 WL 13234176, at *5 (N.D. Ga. Aug. 8, 2011) (holding that Dubai was an adequate forum even though its law "does not provide for oral testimony, full discovery, or independent experts").

Courts have long credited defendants' representations that they will submit to the jurisdiction of a foreign forum for the purpose of *forum non conveniens* analysis, without extensive evaluation of whether the procedural rules that govern the course of litigation in the other forum are comparable to those applied in federal courts in the United States.  *See, e.g.*, *Melgares v. Sikorsky Aircraft Corp.*, 613 F. Supp. 2d 231, 246 (D. Conn. 2009); *Jose v. M/V Fir Grove*, 801 F. Supp. 349, 352 (D. Or. 1991).  And, here, Boeing has expressly represented that it will "agree to consent to jurisdiction in

Malaysia as a condition to dismissal[,]" (FNC Mem. at 22)—a representation that this Court accepts, and deems sufficient with respect to the adequacy issue. *See Fortaner*, 504 F. App'x at 580 (noting that the requirement of an available and adequate alternative forum "is ordinarily satisfied when the defendant agrees to submit to the jurisdiction of the alternative forum" (citation omitted)); *see also Azima*, 305 F. Supp. 3d at 173 (rejecting defendant's *forum non conveniens* argument where defendant was "careful to avoid making any representation that it would necessarily consent to the [alternative court's] jurisdiction with respect to the [plaintiff's] claims").

        2.     <u>The Balance Of The Public And Private Interests Weighs In Favor Of Dismissal Of These Claims On Convenience Grounds</u>

        a.     *Malaysia's Public Interest In These Products Liability Claims Is Generally Greater Than That Of The United States*

Boeing's status as an aircraft manufacturing company that is founded and headquartered in the United States necessarily means that the United States has a significant public interest in any products liability claims that are brought against it. *See Lueck*, 236 F.3d at 1147 (noting that "[t]he citizens of Arizona certainly have an interest in the manufacturing of defective products by corporations located in their forum"). But when a disaster like the one at issue here occurs, the key question as far as the *forum non conveniens* balancing is concerned is whether the significant public interest of the country that manufactured the aircraft outweighs the public interest of the country that maintained and operated the ill-fated plane, and courts evaluating similar products liability ligation have routinely considered the public interest of the carrier's country to be weighed most heavily in the context of their consideration of *forum non conveniens*. *See Schijndel v. Boeing Co*., 263 F. App'x 555, 557 (9th Cir. 2008) (finding, in litigation arising from crash that occurred in Singapore, that the

district court did not abuse its discretion in granting *forum non conveniens* motion based on finding that Singapore's interest in litigation was greater, even though "the aircraft and some components were manufactured in the United States") (internal quotation marks omitted); *see also Clerides*, 534 F.3d at 630 (recognizing the interest of foreign countries "in regulating the use of allegedly defective products within their borders").

One can certainly conceive of a case in which the interest of the country where the aircraft is manufactured might be considered superior to that of the country where the aircraft was maintained and operated—say, in a case involving specific allegations of fact pertaining to a single identified design or manufacturing defect that allegedly caused the crash. *See, e.g.*, *D.F. by & through Amador v. Sikorsky Aircraft Corp*., No. 13-cv-0331, 2017 WL 4922814, at *2 (S.D. Cal. Oct. 30, 2017) (alleging that an individual's death was caused by a known defect in a helicopter's wiring). But, here, Plaintiffs intend to proceed on a *res ipsa* theory of causation. (*See, e.g.*, Compl., *Keith v. The Boeing Co.*, 17cv0518, ECF No. 1-3, ¶ 58 (alleging that "there are no reasonable causes and no evidence of other causes for the disappearance of Flight MH370" beyond a product defect); Compl., *Wood v. Boeing Co.*, 16cv1149, ECF No. 1-3, ¶¶ 44–45 (alleging that because the safety investigation "has, to a reasonable degree of certainty, foreclosed . . . pilot error, pilot suicide, terrorism or other foul play, maintenance error, and weather" as the cause of the disappearance of Flight MH370, "a reasonable inference that can be drawn from all of the available evidence is that the disappearance of Flight MH370 was the result of one or more defects in the manufacture and/or design of the airplane"); *see also* Motley Rice FNC Opp'n at 8 (noting that "[t]he Malaysia

investigation report found no problems with the pilots and other crew, training, maintenance, security and cargo").)  And given that no one specific cause of the disappearance of Flight MH370 has been claimed affirmatively, much less that a certain known design or manufacturing defect precipitated this accident, this Court is hard pressed to find that the interests of the United States in resolving the instant product-defect claims against Boeing outweigh what is, at its core, a Malaysian tragedy, for the reasons explained above.

Put another way, despite Plaintiffs' general contention that (by process of elimination) a mechanical problem with the U.S.-manufactured Boeing aircraft must have caused the events that give rise to their claims, "a defendant's manufacturing activities within the U.S. do not tilt the public interest in favor of retaining jurisdiction where overseas events are the primary catalyst for litigation initiated by foreign plaintiffs."  *In re Air Crash Near Peixoto De Azeveda*, 574 F. Supp. 2d at 288; *see also Air France*, 760 F. Supp. 2d at 845 (explaining that "the American interest here, ensuring the quality of component parts on aircraft and protecting the rights of two American citizens, is real and legitimate but less significant than the French interest"); *Clerides*, 534 F.3d at 630 (noting that while the "United States has an interest in regulating domestic companies, its interest is matched by the interests of Greece and Cyprus in regulating the use of allegedly defective products within their borders").  The same public interest factors discussed in Part IV.A.2.a., *supra*, that weigh in favor of the dismissal of the MDL cases involving Montreal Convention claims are equally applicable to the MDL cases that involve wrongful death and products liability claims, because both sets of claims arise from the same underlying set of facts.  And under the

circumstances presented here, there can be no dispute that Malaysia—which owned and operated the aircraft at issue as part of its fleet of national carriers on the day of the plane's disappearance—has the primary public interest in litigating these products liability claims.

> b.    *There Are Compelling Private Interests On Both Sides, But Much Relevant Evidence Is Located Outside The United States, And The Prospect Of Impleading Raises Complex Immunity Considerations That Weigh In Favor Of Dismissal*

The balancing of the private interests is a closer call in the products liability context than it was with respect to the Montreal Convention claims.  Plaintiffs are asserting manufacturing and design products liability claims directly against Boeing—a United States party—and it is undeniable that most of the evidence pertaining to these claims is inside the United States.  This would suggest that the private interest factor concerning the location of the evidence points squarely in the direction of litigating the claims in the United States; however, notably, Boeing has agreed to make all such evidence available in Malaysia, and has also agreed to pay any judgment that the Malaysian courts hand down.  (*See* FNC Mm. at 22 n.5.)

Most importantly, "[e]ven if plaintiffs intend to base their case on the negligence of defendants in the planning, design, manufacture, assembly, testing, service and inspection of the aircraft and its engines, the evidence regarding the crash itself and the actions of [the airline] are central to the tragedy."  *Nolan*, 762 F. Supp. at 683; *see also King v. Cessna Aircraft Co.*, 562 F.3d 1374, 1384 (11th Cir. 2009) (affirming *forum non conveniens* dismissal where evidence regarding causation was located in the foreign forum); *Lueck*, 236 F.3d at 1146 (affirming *forum non conveniens* dismissal where foreign evidence relating to the cause of the accident was "essential").  This is

55

particularly so because Plaintiffs plan to proceed both on traditional negligence and strict products liability theories, and on a *res ipsa loquitur* theory of causation, as noted above.  (*See* Mot. Hr'g Tr. at 38:4–8.)  To succeed on the latter theory, Plaintiffs will have to rule out other likely causes of the plane's disappearance—e.g., weather, terrorism, crew sabotage, and the like—and a substantial portion of the evidence regarding possible alternative causes is located in Malaysia, as previously discussed. (*See* Part IV.A.2.b., *supra*.)  Similar evidence pertaining to the cause of the disaster is likely located in Australia, the United Kingdom, and other non-U.S. countries.  (*See* Podhurst FNC Opp'n at 15 (noting that the pieces of wreckage that washed ashore were taken to Australia, and that the Inmarsat satellite communication data is located in the United Kingdom).)[26]  Thus, when the nature of these claims and the scope of the related litigation is carefully considered, the location-of-the-evidence aspect of the private interest factor tips in favor of dismissing the instant claims.

It is also clear that other types of relevant evidence—including damages evidence—is largely located outside of the United States.  That is, while Plaintiffs' counsel and their retained expert witnesses are, in fact, located inside the United States (*see* Motley Rice FNC Opp'n at 10; Podhurst FNC Opp'n at 28), the vast majority of the decedents and the plaintiffs are from places other than Malaysia, such as China and Australia (*see, e.g.*, Podhurst FNC Opp'n at 17–18).  Therefore, evidence pertaining to damages with respect to the products liability claims in these MDL cases is located abroad—in locales other than the United States *or* Malaysia—and, indeed, it might well be more convenient and less costly to bring these claims to trial in Malaysia, given that

---

[26]  Plaintiffs maintain that the satellite communication data "is also in the possession of Boeing in the United States" (Podhurst FNC Opp'n at 14), but have not cited any evidence regarding this contention.

the places where most of the damages evidence is likely to be are physically closer to Malaysia than to the United States.  *See In re Air Crash at Madrid, Spain, on Aug. 20, 2008*, 893 F. Supp. 2d at 1033  (noting that the costs of transporting witnesses to trial would be lower if case were litigated in Spain).  In other words, the dearth of U.S.-based plaintiffs or decedents means that both Plaintiffs and Defendants will likely face evidence-related burdens regardless of where the products liability cases are litigated. *See id.*

An additional private interest factor related to the litigation of Plaintiffs' products liability claims in the United States is the extent to which Boeing could, or would, seek to implead all potential defendants.  *See Piper Aircraft Co.*, 454 U.S. at 259 (noting that the ability to implead the estate of the pilot was a factor that weighed in favor of a *forum non conveniens* dismissal).  Whether or not Boeing can implead MAS or MAB as third party defendants raises questions of sovereign immunity, given that both MAS and MAB appear to be agencies or instrumentalities of the Malaysian government for purposes of the Foreign Sovereign Immunities Act.  (*See* Plaintiffs' Resp. to MAS's Rule 12(b)(1) Mot. to Dismiss Under the Foreign Sovereign Immunities Act, ECF No. 64, at 10 n.6 (conceding that MAS and MAB are agencies or instrumentalities of the Malaysian government but opposing dismissal based on sovereign immunity); *see also* FSIA Mem. at 12 (arguing that MAS and MAB are presumptively immune from suit and that Plaintiffs have not established that any FSIA exception applies).)  And there appear to be other potentially sovereign defendants:  the plaintiffs in the Flight MH370-related cases that are pending in Malaysia have named several Malaysian government entities as defendants, including the Department of Civil

Aviation, the Royal Malaysian Air Force, the Immigration Department of Malaysia, and the Government of Malaysia, as well as certain individual Malaysian officials.  (*See* Singh Decl. ¶ 9.)  Any effort to implead such defendants would substantially complicate any litigation involving the wrongful death and products liability claims that are pending against Boeing in the United States.  *See Kryvicky v. Scandinavian Airlines Sys.*, 807 F.2d 514, 516 (6th Cir. 1986) (finding that district court did not abuse its discretion in granting *forum non conveniens* dismissal where, among other things, "the defendants could not implead Spanish aviation authorities or [foreign airline] in U.S. courts").

The potential of intractable immunity questions that might stymie Boeing's ability to implead other defendants raises the prospect of precisely the kind of "oppressive and vexatious outcome that *forum non conveniens* dismissal is designed to avoid"—namely, a manufacturer  defendant that is "unable to seek indemnification in the same action in which they are being sued by foreign [p]laintiffs[.]" *Air France*, 760 F. Supp. 2d at 847.  And in the final analysis of the private interest factors at issue, it is this circumstance that persuades this Court that, taken as a whole, the private interest factors favor dismissal of these claims.  *See Piper Aircraft Co.*, 454 U.S. at 259 (noting that "the inability to implead potential third-party defendants" is a factor that can weigh in favor of a *forum non conveniens* dismissal); *In re Air Crash Near Peixoto De Azeveda, Brazil, on Sept. 29, 2006*, 574 F. Supp. 2d at 289 (finding that the "lack of jurisdiction in this forum over potentially liable parties" was an "important factor[]" in favor of *forum non conveniens* dismissal).

c.    *Dismissal Is Warranted Even With Respect To The Cases
With Concrete Connections To The United States*

Finally, the Court has considered whether the fact that some of the plaintiffs and

decedents in these MDL products liability cases have concrete connections to the

United States impacts the *forum non conveniens* analysis, and for the following reasons,

it has determined that such ties do not demand a different result.  Thus, even when the

products liability claims of U.S. plaintiffs and/or U.S. decedents are isolated and that

status is taken into account, the United States is still not a convenient forum for the

litigation of manufacturing claims against Boeing related to the Flight MH370 disaster.

The *Wood* lawsuit presents the closest call in this regard, given that there are

U.S. parties on both sides, and an American decedent, which suggests that much of the

relevant discovery involves evidence that is inside the United States.  (*See Wood v. The

Boeing Co.*, 16cv1149.)  But as previously explained, given the tort theories on which

Plaintiffs are proceeding, evidence and witnesses pertaining to the aircraft, the crew,

the events preceding the disappearance, and the search will be indispensable to

litigating Plaintiffs' claims.  *See Nolan*, 762 F. Supp. at 683; *King*, 562 F.3d at 1384;

*Lueck*, 236 F.3d at 1146.  This same evidence will likewise be necessary to resolve the

products liability claims that Plaintiff Li Li—a United States citizen residing in

China—and Plaintiff Yang Chen—a Chinese citizen residing in the United States—have

brought on behalf of their deceased parents, who were both Chinese citizens.  (*See Li v.

The Boeing Co.*, 16cv1128; *Chen v. The Boeing Co*., 16cv1165.)  And just as with the

Montreal Convention claims, the United States' strong public interest in securing a

legal remedy for its citizens—specifically, Decedent Wood and the Meng children—is

nonetheless overshadowed by Malaysia's overwhelming interest in the resolution of

claims concerning this national disaster.  *See In re Air Crash Near Peixoto De Azeveda*, 574 F. Supp. 2d at 288; *Air France*, 760 F. Supp. 2d at 845; *Clerides*, 534 F.3d at 630.

The handful of other cases that have concrete connections to the United States concern attenuated relationships that do not give rise to a significant public or private interest in having the claims litigated in the United States, for the reasons laid out above, in Part IV.A.2.c.[27]  The Court does give some deference to the plaintiff's choice of forum when the products liability and wrongful death claims are brought by, or on behalf of, American citizens, just as with the Montreal Convention claims.  But in this Court's view, even when Boeing is the defendant, the balance of the *Piper* factors weighs against litigation of these claims in the United States.  *See, e.g.*, *Fortaner*, 504 F. App'x at 580–81 (affirming *forum non conveniens* dismissal of products liability claims against Boeing); *Nolan*, 919 F.2d at 1069 (same).

## V.    CONCLUSION

At its core, this case is about the unexplained disappearance of a passenger plane operated by Malaysia Airlines as part of its national air carrier fleet following its departure from a Malaysian airport.  The disappearance of Flight MH370 was the subject of a years-long investigation by Malaysian authorities, and while a host of other countries undeniably participated and undoubtedly have some interest in the legal claims that have been made in the wake of this tragedy—including China, Australia,

---

[27]  Plaintiffs Keith and Richards are United States citizens, and thus their choice of forum is entitled to deference, but as with Plaintiffs Gaspard and Smith, it appears that they may have no pre-accident connections to the decedents they represent and may have been selected solely for purposes of this litigation.  (*See* Part IV.A.2.c., *supra*.)  *See also Piper Aircraft Co.*, 454 U.S. at 239.  Plaintiff Chen is a resident of the United States, but not a citizen, and Meng Zhang's connection to the United States is predicated on her status as a green-card holder and her *past* work and residence in the United States.  In the *Gaspard* case, the Wang Decedents' connection is premised on Gaspard's citizenship, and Rui Wang's employment with an American company, even though he lived and worked overseas.

India, and the United States—these other points of connection do not alter the fundamental and substantial nexus between this tragic incident and the country of Malaysia. In consideration of all of the relevant *forum non conveniens* factors, this Court has concluded that litigation in the United States related to the Flight MH370 disaster is inconvenient, and that dismissal of the MDL cases in favor of Malaysia is warranted. Thus, as reflected in the attached Order and subject to the conditions laid out therein, Defendants' joint motion for *forum non conveniens* dismissal is **GRANTED**, and the cases in this MDL are **DISMISSED** without prejudice. Moreover, Defendants' other threshold motions are **DENIED** as moot.

DATE: November 21, 2018                    *Ketanji Brown Jackson*
                                           KETANJI BROWN JACKSON
                                           United States District Judge